DICO TIRE, INC., Appellant,

v.

Roger D. CISNEROS, Appellee.

No. 13–95–308–CV.

Court of Appeals of Texas,
Corpus Christi.

Aug. 14, 1997.

Rehearing Overruled Oct. 2, 1997.

Gregory T. Perkes, Lee Casstevens, Wood, Burney, Cohn & Viles, Corpus Christi, for Appellant.

William R. Edwards, III, Kelly Sue Putney, John Blaise Gsanger, Edwards, Terry, & Edwards, Corpus Christi, for Appellee.

Before SEERDEN, C.J., and FEDERICO G. HINOJOSA, Jr. and YANEZ, JJ.

## OPINION

FEDERICO G. HINOJOSA, Jr., Justice.

This is a negligence and product liability case. Appellee, Roger Cisneros, sued appellant, Dico Tire, Inc., for injuries he sustained when a tire exploded as he was repairing it. After the jury found that a design defect, a manufacturing defect, and Dico's negligence caused appellee's injuries, the trial court rendered judgment against Dico in the amount of $243,247.65, plus prejudgment and post-judgment interest. By thirty points of error, Dico challenges the sufficiency of the evidence, the submission of certain jury questions, Cisneros' jury argument, the assessment of prejudgment interest for future damages, and the denied cross-examination of Cisneros. We affirm.

At the time of the accident, Cisneros was a tire service repairman for E.B. Creager Tire & Battery, Inc. On May 22, 1992, he was sent to a construction site to repair a tire on a front-end loader. He first put a small amount of air into the tire to find the leak and then deflated the tire. After separating the tire from the wheel, he noticed that the tire had previously been patched at least three times. Cisneros patched the new hole and remounted the tire on the rim. He seated, or locked, the tire's beads against the steel flange of the rim by inserting four to five pounds of air pressure into the tire. Once the beads appeared to be seated, Cisneros continued to inflate the tire to thirty-five pounds while monitoring air pressure gauges. This pressure was well within the maximum of fifty pounds for which the tire was rated. During the inflation, Cisneros stood the tire upright on the ground, resting it on the tread. Cisneros did not use the safety restraining device which was available in his truck.

After the tire was inflated, the tire and wheel assembly fell flat on the ground. Cisneros recapped the valve stem which was facing up. Then, as Cisneros was leaning forward to reach under the tire to lift it up, the side to the ground blew off the wheel. The force of the expelled air propelled the tire upward into Cisneros' face, causing him to fly backwards. Cisneros claims that at this point one side of the tire was free of the wheel assembly.

Cisneros' nose and lip were cut open and several of his teeth were damaged. He was transported to a hospital emergency room where he was treated by a plastic surgeon. Eventually, Cisneros was also treated by a dentist, a neurologist, and an ear, nose, and throat specialist. He incurred approximately $32,000.00 in medical expenses and lost $1,100.00 in wages.

Cisneros sued Dico, alleging that the tire was defectively manufactured because the bead bundles deformed during the manufacturing process. He also alleged that a defective design caused the bead bundles to be susceptible to deformation during manufacture. In addition, Cisneros contended that other designs were available to protect against deformation in the manufacturing process and that the alternate designs reduced the risk of an explosive blow off, even when a deformation occurs. Cisneros further asserted that Dico was negligent in its post-manufacture inspection of the tire because a reasonably prudent inspection would have disclosed the defect.

Dico answered and alleged that Cisneros' own negligence was the proximate cause of the accident. The jury found that design and manufacturing defects in the tire were pro-

ducing causes and that Dico's negligence was the proximate cause of the accident. The jury also found that Cisneros was not negligent.

### 1. SUFFICIENCY OF THE EVIDENCE

Dico's first eleven points of error challenge the legal and/or factual sufficiency of the evidence.

When a party without the burden of proof complains on appeal of a jury finding, the appropriate points of error are that there is "no evidence" or "insufficient evidence" to support the jury finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983).

When we review a "no evidence" or legal sufficiency of the evidence point of error, we consider only the evidence and reasonable inferences that tend to support the jury's finding, and we disregard all evidence and inferences to the contrary. *Responsive Terminal Sys. Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). A legal sufficiency point must and may only be sustained when the record discloses: 1) a complete absence of evidence of a vital fact; 2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no more than a mere scintilla; and 4) the evidence established conclusively the opposite of the vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is not more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). The test for the application of this no evidence/scintilla rule is that if reasonable minds cannot differ from the conclusion, then the evidence offered to support the existence of a vital fact lacks probative force, and it will be held to be the legal equivalent of no evidence. *Id.*

When we review an "insufficient evidence" or factual sufficiency point of error, we consider, weigh, and examine all of the evidence which supports or undermines the jury's finding. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We set aside the verdict only when we find that the evidence, standing alone, is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

By the following points of error, Dico contends that the evidence is legally and/ or factually insufficient to support the following findings:

Point 1 that there was a design defect in the tire;

Point 2 that there was a manufacturing defect in the tire at the time it left Dico's possession;

Point 3 that Dico was negligent;

Point 4 that Dico's acts or omissions proximately caused the occurrence in question; and

Point 5 that the tire as manufactured and designed was a producing cause of the accident.

Dico contends that the trial court erred in rendering judgment against Dico when it refused to disregard the jury's findings for questions 1a and 2 through 4b. Dico relies on its strong safety and performance records and appellee's alleged lack of scientifically reliable expert testimony.

The pertinent jury questions and answers are as follows:

#### QUESTION NO. 1

Did the negligence, if any of those named below proximately cause the occurrence in question?

Answer "Yes" or "No" for each of the following:

a. Dico Tire, Inc., acting by and through its agents, employees or representatives.

Answer: Yes

## QUESTION NO. 2

Was there a manufacturing defect in the tire in question at the time it left the possession of Dico Tire, Inc. that was a producing cause of the occurrence in question?

A "defect" means a condition of the product that renders it unreasonably dangerous. An "unreasonably dangerous" product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowledge common to the community as to the product's characteristics.

"Producing cause" means an efficient, exciting or contributing cause that, in natural sequence, produced the occurrence. There may be more than one producing cause.

Answer: __Yes__

## QUESTION NO. 3

Was there a design defect in the tire in question at the time it left the possession of Dico Tire, Inc. that was a producing cause of the occurrence in question?

A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use by persons with similar skills as Roger Cisneros.

"Producing cause" means an efficient, exciting or contributing cause that, in natural sequence, produced the occurrence. There may be more than one producing cause.

Answer: __Yes__

If, in answers to Questions Nos. 1, 2 and/or 3, you have found that the negligence of more than one of the parties and/or one or more defects in the tire caused the occurrence, then answer Question No. 4. Otherwise, do not answer Question No. 4.

## QUESTION NO. 4

For each person or product found by you to have caused the occurrence, find the percentage caused by each.

The percentages you find must total one hundred percent. The percentage of causation attributable to a person or product is not necessarily measured by the number of acts, omissions or product defects found.

a. Dico Tire, Inc. acting by and through its agents, employees or representatives — Answer: __80%__

b. The tire in question — Answer: __20%__

c. Roger D. Cisneros — Answer: __0%__

■ To establish causation in a personal injury case, a plaintiff must prove that the conduct of the defendant caused an event and that this event caused the plaintiff to suffer compensable injuries. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995); *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex.1984). The elements of a negligence cause of action are a duty, a breach of that duty, and damages proximately caused by the breach of duty. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995). The care taken by the supplier of a product in its preparation, manufacture, or sale is the ultimate question in a negligence action. Negligence looks at the acts of the manufacturer and determines if it exercised ordinary care in design and production.

*Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex.1995); *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871 (Tex.1978). To prove that the defendant failed to use ordinary care, the plaintiff must show the defendant did not exercise that degree of care that a person of ordinary prudence would have used under the same circumstances. *Gannett Outdoor Co. of Tex. v. Kubeczka*, 710 S.W.2d 79, 87 (Tex.App.—Houston [14th Dist.] 1986, no writ); *Dawes v. J.C. Penney & Co.*, 236 S.W.2d 624, 628 (Tex.Civ.App.—Waco 1951, writ ref'd n.r.e.); see *Buchanan v. Rose*, 138 Tex. 390, 159 S.W.2d 109, 110 (1942).

■ Negligence requires a showing of proximate cause, while producing cause is the

test in strict liability. *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995). The components of proximate cause are cause-in-fact and foreseeability. *Boys Clubs,* 907 S.W.2d at 477. These elements cannot be established by mere conjecture, guess, or speculation. *Id.* Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by his negligent act. *Id.* at 478. The test for cause-in-fact is whether the negligent act or omission was a substantial factor in bringing about injury, without which the harm would not have occurred. *Id.* Cause-in-fact is also a component of producing cause. *Union Pump,* 898 S.W.2d at 775. Producing cause is defined as an efficient, exciting, contributing cause which, in a natural sequence, produced the injuries complained of. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex.1995); *Rourke v. Garza,* 530 S.W.2d 794, 801 (Tex.1975).

▇▇▇▇ A defectively designed product is one that is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. *Turner v. General Motors Corp.,* 584 S.W.2d 844, 847 n. 1, 851 (Tex.1979). Design defect cases are not based on consumer expectancy, but on the manufacturer's design of a product which makes it unreasonably dangerous, even though not flawed in its manufacture. *Ford Motor Co. v. Pool,* 688 S.W.2d 879, 881 (Tex.App.—Texarkana 1985), *aff'd in part on other grounds, rev'd in part on other grounds,* 715 S.W.2d 629 (Tex.1986).

▇▇▇▇ Whether a product was defectively designed requires a balancing by the jury of its utility against the likelihood of and gravity of injury from its use. *Caterpillar, Inc.,* 911 S.W.2d at 383–84; *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 746 (Tex. 1980). We evaluate whether a product has a design defect in light of the economic and scientific feasibility of safer alternatives. *Caterpillar Inc.,* 911 S.W.2d at 384; *see Boatland,* 609 S.W.2d at 746. If there are no safer alternatives, a product is not unreasonably dangerous as a matter of law. *Caterpillar Inc.,* 911 S.W.2d at 384; *see Boatland,* 609 S.W.2d at 748.

▇▇▇▇ To recover for a manufacturing defect, the plaintiff must show a manufacturing flaw which renders the product unreasonably dangerous; that the defect existed at the time the product left the seller, and that the defect was the producing cause of the plaintiff's injuries. *Pool,* 688 S.W.2d at 881; *Fitzgerald Marine Sales v. LeUnes,* 659 S.W.2d 917, 918 (Tex.App.—Fort Worth 1983, writ dism'd). An unreasonably dangerous product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary consumer, with the ordinary knowledge common to the community as to its characteristics. *Turner,* 584 S.W.2d at 846–47. A manufacturing defect exists when a product does not conform to the design standards and blueprints of the manufacturer and the flaw makes the product more dangerous and therefore unfit for its intended or foreseeable uses. *USX Corp. v. Salinas,* 818 S.W.2d 473, 483 n. 8 (Tex. App.—San Antonio 1991, writ denied); *Pool,* 688 S.W.2d at 881. The manufacturing defect theory is based upon a consumer expectancy that a mass-produced product will not differ from its counterparts in a manner which makes it more dangerous than the others. *USX Corp.,* 818 S.W.2d at 477 n. 2; *Pool,* 688 S.W.2d at 881.

### a. Legal Sufficiency

Cisneros testified that after inflating the tire with four or five pounds of pressure, the bead appeared to be seated next to the wheel's flange. He then inflated the tire to thirty-five pounds of pressure, recapped the valve stem, and leaned down to pick up the tire. As he was bent over the tire, it exploded and hit him in the face. According to Cisneros, one side of the tire was over the flange after the explosion. Testimony from other witnesses supports Cisneros' claims. Harry Cobb, a sales representative present at the construction site when the accident occurred, testified that he heard a loud popping noise and saw Cisneros fly backward while the tire bounced about ten feet. Cobb also testified that Cisneros' face, nose, and mouth appeared to be injured. Creager Tire employees, who saw the tire and wheel assembly after the accident, testified that one bead of the tire was separated from the

wheel. Ricardo Martinez, assistant service manager for Creager, testified that he had no doubt that the tire blew off the flange.

■ Walter Harm, an engineer for Uniroyal Tire Company, testified about the design, manufacture, and testing of tire products. Harm has an economics degree from Wayne State University, a chemical engineering degree from William State University, and has completed some graduate work in chemical engineering at Wayne State. The entire thirty-one years of his professional career has been spent working for Uniroyal. Harm held the positions of tire construction engineer, materials engineer, research engineer, automotive manager for original equipment, and senior engineer for tire reliability. In these positions, Harm engineered the component parts of tires, evaluated new products, and tested tires to failure (burst testing) to determine how the components related to the cause. At one point in his career, Harm supervised quality control by inspecting tires before and after curing. When faulty tires were returned by customers during this period, Harm checked them for component failures. Harm also has experience in developing the materials that go into the make-up of component parts. He has performed materials failure testing and has issued production specifications for materials.

Harm described the wheel at issue as a single-piece wheel and the tire as a multistrand weftless bead tire. He used a videotape provided by Dico to explain the process of building the tire. Harm explained that a tire's plies are wrapped around rings of wires, or beads, located on both of the tire's inner edges. The circumference of the bead is smaller than the wheel's flange, or outer edge. The strength of bead wires is meant to prevent the tire from blowing over the flange.

Harm also explained how a tire like the one at issue would be mounted onto a wheel. According to Harm, one bead is placed over the flange as far as it will go. The remainder of the bead is lubricated and then forced onto the wheel. This bead falls into the narrow drop center of the wheel, allowing the process to be repeated with the other bead.

Next, the tire is slightly inflated to seat the beads against the flanges. During this process, the beads trap air and move away from the narrow drop center out onto the larger portion of the wheel until they are locked against the flange. Once the beads appear to be seated, the inflation process can continue pursuant to the manufacturer's specifications.

Harm testified that there are two possible causes for a tire bead to blow over the flange; a broken bead or a defective bead. In this case, x-rays eliminated the possibility that broken beads caused the accident. Harm explained, however, that a defective bead can give the appearance of being seated by hanging up. If the hang-up goes unnoticed, then the tire can blow over the flange in some instances.

Harm testified that cording, or bead hang-ups, are a normal part of the inflation procedure. A hang-up occurs when a portion of the bead does not move uniformly along the wheel out to the flange. Generally, a hang-up will release itself causing a popping sound as the wires in the bead hit against the flange. On occasion a hang-up will cause the tire to have the appearance of being seated because the air pressure forces the tire's side wall over the flange, hiding the fact that the bead did not move as it should have. Some hang-ups result in tire failure when the forces exerted on the tire are not spread evenly on all wires and a weakened portion of the bead blows over the flange. If the inflated tire were lying flat on the ground and the underside of the tire blew over the flange, the entire wheel assembly would be forced upward as air is expelled from the tire against the ground. A tire with thirty-five pounds of pressure could be projected upward ten to twenty feet.

In Harm's opinion, a hang-up of a defective bead caused the explosion at issue. The explosive release of air against the ground forced the tire and wheel assembly up into Cisneros' face as he was leaning over the tire. Harm based his opinion on his thirty-one years of experience in the tire industry, his training, his knowledge, and the evidence presented. He relied on testimony that the tire was inflated within the specified operat-

ing pressures, that the bead appeared to be seated, that there was a loud explosion, and that after the event one bead was over the flange. Harm stated that he found no abnormalities during his inspection of the wheel assembly. However, x-rays revealed that the bead wires were not tightly wound and formed gaps. He explained that as wires gapped during curing, rubber flowed in to fill the spaces. When this happens, the tire has a dished out appearance and feel along its circumference. Harm testified that he could see and feel the defect in the bead. Because of the defect, the wires were not supplying the strength required to hold the bead on the wheel, and the bead slipped over the flange causing an explosive release of air pressure. Harm testified that the tire blew off the flange at this point in time, as opposed to the times prior or subsequent to the particular mounting procedure at issue, because the hang-up involved a weak spot which could not withstand the exerted pressures.

Harm testified that by design, the bead is supposed to be a tightly wound bundle of wires, symmetrical in shape, following a definite pattern, and laying in a definite layer of the tire. He explained, however, that during vulcanization, or curing, the wire ends can unwind and move within the liquid rubber if they are not secured. To prevent unwinding, Uniroyal uses tie-downs which are squares of woven fabric wound around the bead wires to keep them secure. Other methods of reducing the risks caused by loose wires included using a computer controlled hex design for greater uniformity in strength throughout the bead, or using a larger diameter wire to increase the tensile strength of the bead. These methods could also be combined. Harm stated that the three methods were in use in the tire industry, that they would reduce the risk of injuries, and that they would not decrease the tire's utility. Harm testified that the risk of injury from defective beads could also be reduced if the manufacturer visually and manually inspected each tire after curing. If a manufacturer made these inspections, defective tires would be rejected before leaving the manufacturer's possession.

Harm testified that Dico does not include tie-downs for bead wires in the design of its multistrand weftless tire. The tire at issue was described as such a tire. X-rays, viewed by the jury, showed that the wires in this tire were not as tightly wound as they should have been and gaps appeared between the wires. Harm opined that because the wires were encased in rubber and could not shift after the curing procedure was completed, they moved during the manufacturing process. Harm also testified that he could feel and see "dishouts" along the entire circumference of the tire. For this reason, it was his opinion that the bead was defective at the time the tire left Dico's possession. According to Harm, the tire was unreasonably dangerous as designed and manufactured.

Harm also reviewed the deposition testimony of Clarence E. Erickson, a Dico engineer. Erickson's testimony showed that Dico did not have a manual post-cure inspection process for each tire. Erickson's deposition testimony was read to the jury and showed that Dico did not inspect its beads after curing was completed. A videotape showing Dico's manufacturing process, played during Harm's testimony, did not show a manual inspection procedure. Harm testified that if Dico had operated in an ordinary and prudent manner as a reasonable tire company should, they would have a post-cure inspection procedure. Harm testified that Dico's failure to properly inspect finished tires was negligence. If Dico had inspected its finished tires, the defect at issue could have been found during a hand inspection, and the tire at issue would have been rejected.

■ Dico contends that Harm's testimony was without probative value because it varied materially from the facts that were related by Cisneros. Specifically, Dico asserts that Cisneros claimed that the bead was properly seated and that Harm rejected this fact in developing his theory as to how the accident occurred. The record, however, shows Cisneros testified that the bead appeared to be seated. We conclude that Cisneros' testimony does not vary materially from the facts on which Harm relied.

Dico also contends that Harm's testimony was not scientifically reliable because it does not satisfy the Texas Supreme Court's reliability test set forth in *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995). Although the *Robinson* test was aimed at the admissibility of expert testimony,[1] which Dico did not challenge at trial, the Supreme Court, in *Merrell Dow Pharmaceuticals, Inc. v. Havner,* recently held the test was applicable to a no evidence review of scientific evidence. 953 S.W.2d 706, 708, 714 (Tex.1997). However, not every testifying expert is providing scientific evidence. *See S.V. v. R.V.,* 933 S.W.2d 1, 41 (Tex.1996) (Cornyn, J., concurring) (citing Edward J. Imwinkelried, *The Next Step After* Daubert: *Developing a Similarly Epistemological approach to Ensuring the Reliability of Nonscientific Expert Testimony,* 15 CARDOZO L.REV. 2272, 2278 (1994)). Some expert testimony is derived from specialized knowledge or technical expertise. TEX.R. CIV. EVID. 702. We conclude that Harm was not providing scientific evidence; his testimony was derived from specialized knowledge and technical expertise. We, therefore, rely on *Schaefer v. Texas Employers' Ins. Ass'n,* 612 S.W.2d 199 (Tex.1980), for the appropriate test.

In order to constitute proof, Harm's testimony had to establish the "reasonable probability" of a causal connection between the tire and the injury. *See Schaefer,* 612 S.W.2d at 202. Reasonable probability is determined by substance and context of the opinion, and does not turn on semantics or on the use of a particular term or phrase. *Havner,* 953 S.W.2d at 711; *Burroughs Wellcome,* 907 S.W.2d at 500; *Schaefer,* 612 S.W.2d at 202–05. The entire substance of the expert's testimony must be examined to determine if the opinion is based on demonstrable facts and does not rely solely on assumptions, possibility, speculation, and surmise. *Havner,* 953 S.W.2d at 712; *Schaefer,* 612 S.W.2d at 204–05.

After reviewing the substance of Harm's testimony, we find that it establishes the reasonable probability that a defective bead in a Dico tire caused Cisneros' injuries. The testimony was derived from Harm's thirty-one years in the tire industry spent in design, production, testing, and quality control. Harm's testimony is based on demonstrable facts rather than assumptions, possibility, surmise, and speculation. We conclude, therefore, that Harm's testimony is reliable proof of design and manufacturing defects as well as of Dico's negligence. Moreover, portions of Harm's testimony were similar to testimony provided by other witnesses.

Clarence Erickson, a retired Dico tire engineer, testified that a tightly wound bead bundle has more strength than one with gaps. He agreed that there was an explosive separation of the tire from the rim and did not dispute the fact that the tire and wheel assembly was propelled off the ground. Erickson admitted that a Dico tire with a defective bead which allowed the tire to blow over the flange would absolutely create a dangerous condition. He also testified that the danger would not be one contemplated by the ordinary user. Moreover, Erickson viewed x-rays of the tire at issue. He explained that the underlap moved through the wires. Erickson claimed this was not an unusual occurrence because that was the way Dico made these tires.

Ronald Walker, who had extensive expertise in the area of tire failure analysis, testified that if the bottom side of a tire were not properly seated and the tire was inflated to thirty-five pounds, then a tireman would be in danger if he leaned over the tire. If an explosion occurred at that point, the tireman would be injured. Walker also testified that hang-ups were common occurrences that can affect the construction of the tire by creating weaknesses. Walker opined that one portion of the bead on the tire at issue abraded against the edge of the wheel well, while another portion got "ready to come up over the flange" as pressure was added. At that point, the tire rapidly deflated, the tire and wheel assembly was launched, and the bead came off the wheel.

---

1. *Id.* at 550.

We hold that the evidence is legally sufficient to support the jury's findings on the issues of negligence, design defect, and manufacturing defect. We must now determine if the evidence is factually sufficient by considering all the evidence, whether favorable to the jury verdict or not.

### b. *Factual Sufficiency*

Cisneros testified that rings are molded onto the side of every tire in order to facilitate the bead seating process. These rings should be equidistant from the rim if the bead is properly seated. Cisneros said that he checked the rings and that the bead appeared to be seated. Harm testified that the rings should be concentric if the bead is properly seated. Dico appears to believe that this evidence should weigh heavily in its favor. However, Dico provided no evidence indicating that the rings could not be concentric if there was a hang-up, as described by Mr. Harm, or if the bead appeared to be seated.

Harm testified that the wire used by Dico in the bead on the tire at issue was still used in the tire industry at the time of trial. He stated that the industry was also using a wider diameter wire than that found in the Dico tire. Although fewer strands of the larger wire are used in a bead, Harm said the strength was much greater than using more strands of the narrow wire. Initially, Harm gave an incorrect explanation during a portion of his testimony on mounting a tire. He explained, however, that he was more experienced with passenger tires than those found on heavy equipment. He corrected his testimony after reviewing a manual. Such testimony merely raised a credibility issue which we do not consider.

Harm indicated that he inspected the tire at issue for approximately one-half day. While he admitted that factory inspectors would not have this long to inspect each tire, Harm did say that a hand inspection would have been sufficient to determine whether the tire at issue was defective. Harm admitted that some defective tires did manage to slip through the Uniroyal inspection process, but stated that Uniroyal was not likely to be negligent when this occurred.

Harm testified that he could find no physical evidence of an explosion on the tire or the rim. Instead, he relied on other evidence such as the testimony of Cisneros, witnesses who heard the explosion and saw the result, and the fact that the tire was off the wheel on one side. He admitted that if the bead was properly seated, as it appeared to be, then the bead could not blow over the flange without breaking. However, if the tire was down in the tire well, it could come off the flange. Nevertheless, Harm explained that the tire would not trap air if the bead was all the way into the well because of a gap between the tire and the wheel. The bead had to be positioned at the edge of the well before the tire would inflate.

Manfred Walter, owner of Creager, testified that he found nothing wrong with the tire. He said that he could only remember doing one adjustment during ten years of selling Dico tires. Walter said that Creager continued to sell Dico tires after the accident. Ricardo Martinez testified that he remounted the tire when it was returned to Creager after the accident. He explained that he would not have remounted the tire if he believed it would explode. However, Martinez admitted telling an investigator for Cisneros, approximately two months after the accident, that he thought the Dico tire had a defective bead. Luis Santos, a longtime Creager employee, testified that after doing a careful examination of the bead following the accident, he did not consider the bead defective.

In addition to the previously discussed testimony of Clarence Erickson, his testimony shows that this particular line of tires had been produced for fifteen years. They were first produced by Armstrong and then by Dico, after Dico bought out Armstrong. Erickson could not recall any complaints about the tires during that fifteen-year period. Erickson testified that Dico produces from 30,000 to 40,000 tires of this type every year. Dico conducted substantial testing on this line of tires because it was one of the more popular products. Erickson disagreed that a slight separation in the bead bundle during the vulcanization process would cause the bead to be weak. He explained that the tire

industry made approximately one million weftless tires a day and that the beads are not generally tied down, especially in the size of tire at issue. He claimed, contrary to his deposition testimony, that Dico visually and manually inspected every cured tire. The waves that Harm testified he could feel in the bead were described by Erickson as the tire's texture which was created by a vented innerlining.

During his deposition, Erickson was asked the following question:

In terms of just quality control procedures or inspection procedures with respect to tires that are going to be shipped to customers, are there any quality control procedures or inspections with respect to the bead following the curing process?

Erickson's response was "no." During his testimony before the jury, Erickson explained:

When I made that answer, we had been discussing in detail the bead bundle. So, my answer was that once the tire is cured, you can no longer inspect the bead bundle, per se, because it's already been encased in fabric. You can't see it, so you can't inspect it, except by x-ray.

So, at that time, I said "No." But as I said earlier, that doesn't mean that the tire doesn't go down a convey[o]r, go to final finish and be 100 percent inspected, every single tire we manufacture.

Erickson used the Dico videotape, which he made, to provide an extensive explanation of the tire manufacturing process. He pointed out the innerlining material when it appeared on the videotape. He also described how the bead was locked in place when a woven piece of fabric was stitched down. Toward the end of the videotape, Erickson stated that cured tires are placed on a conveyor, and they move to an area where the tires are trimmed and inspected. However, the inspection process itself was not included on the videotape.

Although Erickson agreed that there was an explosive release of air from the tire, he did not agree that it occurred because the tire separated from the rim. In his opinion, the explosion occurred because a portion of

one bead trapped air pressure down in the tire well. He would not estimate how much pressure the bead could hold in such a position, but he did say that it would have to be a sufficient amount of air to blow the tire off the rim. Erickson was then asked to inspect the tire in such a position. Erickson admitted that there were large gaps between the well and the tire, but he would not admit that the gaps prevented the tire from inflating. Instead he claimed that something, such as dirt, must have sealed the gap.

Erickson was then asked about notes he made after an earlier inspection of the tire. These notes indicated that if the bead on one side of the tire was seated near the flange, then the other bead close to the well would remain in a near perfect circle. In addition, the notes indicated that the bead close to the well could not be moved down into the wheel well without the use of a tool. Erickson did not dispute that these notes were valid at the time they were made, and he stated that he was unfamiliar with tires of the type at issue hanging up in the well, as he opined this tire did.

Testimony from Ronald Walker, in addition to that previously discussed, showed that Walker visually inspected the tire and wheel assembly and x-rayed the bead bundle. He stated that he could find no problems with the tire or wheel that would prevent their continued use. Although Walker agreed that x-rays introduced into evidence by Cisneros accurately represented the condition of the tire as reflected in his own x-rays, he would not say the bead bundle was defective. Walker testified that the beads were intact and that he considered them safe for mounting.

According to Walker, if Harm's theory was correct, then the bead wires would have stretched excessively, leaving a permanent wave all around the tire and a loose bead bundle. He explained that such a wave could be felt around the tire and should be apparent on x-rays. Walker's x-rays of the tire did not disclose waves nor could he feel any. He explained that when the bead is out near the flange, it cannot go over the flange without first breaking. Walker further explained that the bead can potentially seat itself any-

where from the flange to the edge of the wheel well. He also said that it is common for the bead to hang-up on the edge of the well. In Walker's view, the tire came off the wheel in the same manner as it went on, one part of the bead before the other. For this tire to blow off the wheel as it did, one portion of the bead had to be abrading at the edge of the wheel well, while the other portion moved out to the flange and eventually blew over the edge. If the bead was actually down in the wheel well, it would not trap air.

While Walker would not say the accident was caused by an explosion, he did agree that a rapid deflation of pressurized air propelled the tire and wheel assembly into Cisneros' face. However, he believed that Cisneros was struck by the air chuck from the compressor rather than the edge of the wheel assembly. He based this belief on Cisneros' initial accident report which stated that he was inflating the tire when it exploded in his face and on the doctor's testimony that Cisneros was struck by something approximately one-half centimeter long.

Walker's deposition testimony reflected that at the time he assumed there was a manufacturing defect and that the configuration of the bead wire bundle was a less than desirable design for bursting strength. At the trial, Walker explained that the statement was made before he knew the manufacturing and design specifications. In addition, the bead at issue did not burst, thus eliminating the need to make the bead stronger. His testimony indicated that, in spite of the loose wires in the bead bundle, there was no manufacturing defect as long as the tire was used for its designed purpose, that is, on heavy equipment at low speeds. However, Walker admitted that more tightly wrapped wires would yield greater tensile strength and higher bursting pressure for the bead bundle. He also admitted that speed was not an issue in the accident.

█ Harm testified that three alternative designs are available in the tire industry. He explained how the designs would reduce the risk of accidents, such as the one at issue, and that the utility of the product would not be affected. Dico responded by pointing out that the company had virtually no complaints about the tire during its fifteen year manufacturing history. The company also established that the complained of multistrand weftless design was still in use in the industry at the time of the accident. However, Dico did not deny that the alternative designs were safer or claim that the tire's utility would be diminished by the other designs. Accordingly, we find that the jury could believe that the risk of serious injuries outweighed the utility of Dico's design in light of the safer alternatives available in the tire industry. We conclude that the evidence is factually sufficient to support the jury's finding on Question 1 that a design defect exists in the Dico tire. We overrule Dico's 1st point of error.

█ The testimony reflects that, as designed, the bead wires were to be tightly wound after manufacturing. Harm's x-rays indicated, however, that the bead wires were unwound, causing gaps along the bead. He testified that the gaps caused weaknesses in the bead and made them dangerous. His testimony further showed that the wires most likely moved during the curing process because after that point, they are encased in rubber and cannot shift. Harm believed that the gaps in the wire configuration existed at the time the tires left Dico's possession. Walker and Erickson agreed that the x-rays accurately depicted the wire configuration, but they disagreed with Harm that the gapping reduced the bead strength in this particular tire. Dico did not dispute Harm's theory that the wires unwound during the manufacturing process. Erickson agreed that the ordinary user would not contemplate the danger which could be caused should a defective bead bundle allow the tire to blow over the flange. We hold that the evidence is factually sufficient to support the jury's finding on Question 2 that a manufacturing defect exists in the Dico tire. We overrule Dico's 2nd point of error.

█ It is uncontroverted that Cisneros was injured when the tire and wheel assembly was propelled into his face by a rapid or explosive release of air pressure from the tire against the ground. It is also uncontroverted that the tire blew over the flange.

Dico's engineer, Erickson, believed that the blow-over occurred because the bead trapped air while it was still in the wheel well. Harm and Walker both agreed, however, that the tire could not trap air if the bead were in the well. Walker testified that the bead could seat anywhere between the flange and the edge of the well. The men agreed that hangups were a common occurrence during the inflation of a tire. They also agreed that the bead was stronger when the wires were tightly wound.

Harm opined that the blow-over occurred because the bead hung up outside of the well in a manner that would trap air and also gave the bead an appearance of being seated next to the flange. When a weak spot in the bead bundle, caused by gaps between the wires, was unable to maintain its position against the air pressure, the tire blew over the flange. Erickson admitted that the tire would be dangerous if a defect allowed the bead to blow over the flange. Although Walker claimed that the tire was not defective if used as designed for low speed heavy equipment, he did agree that speed was not a factor in the case. We hold that the evidence is factually sufficient to support the jury's findings on Questions 2, 3, and 4(b) that design and manufacturing defects in the Dico tire were the producing causes of Cisneros' injuries. We overrule Dico's 5th point of error.

■ The jury heard conflicting testimony from Harm and Erickson on whether Dico has a manual post-cure inspection process in place for every tire it produces. In addition, the jury viewed a Dico-produced videotape on the company's manufacturing process which did not include such an inspection. Dico did not offer other evidence to support Erickson's claims that all tires were inspected before being placed in the marketplace. According to Harm, the tire at issue would have been rejected by a visual and manual inspection because of its defects. Harm also stated that the reasonably prudent manufacturer, exercising ordinary care, would have such an inspection procedure and that the failure to do so would amount to negligence.

The jury is "the sole judge of the credibility of the witnesses and the weight to be given their testimony." Tex.R. Civ. P. 226a(III); *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex.1993). In resolving contradictions and conflicts, jurors may choose to believe all, part, or none of the testimony of any witness. *Greater Houston Transp. Co. v. Zrubeck*, 850 S.W.2d 579, 590 (Tex. App.—Corpus Christi 1993, writ denied). Thus, the jury could believe Harm and not believe Erickson. We hold that the evidence is factually sufficient to support the jury's findings on Questions 1(a) and 4(a) that Dico's negligence proximately caused Cisneros' injuries. We overrule Dico's 3rd and 4th points of error.

## 2. DAMAGES

By the following points of error, Dico contends that the trial court erred in not disregarding the jury's findings for Question 5(a), (b), and (d) because the evidence was legally and factually insufficient to show:

Point 8 that the sum of $100,000.00 constitutes reasonable compensation for physical pain in the past;

Point 9 that the sum of $60,000.00 constitutes reasonable compensation for mental anguish in the past;

Point 10 that the sum of $50,000.00 constitutes reasonable compensation for physical disfigurement in the past;

Point 11 that the plaintiff will suffer mental anguish and/or physical disfigurement in the future.

In addition, by its twelfth point of error, Dico contends that the trial court erred by submitting the issues of future mental anguish and physical disfigurement to the jury.

The following question asked the jury to determine Cisneros' damages, if any:

### QUESTION NO. 5

What sum of money, if paid now in cash, would fairly and reasonably compensate Roger D. Cisneros for his injuries, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each ele-

ment separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

Do not reduce the amounts, if any, in your answers because of the negligence, if any, of Roger D. Cisneros.

Answer in dollars and cents for:

a. Physical pain in the past Answer: $100,000.00

b. Mental anguish in the past and that in reasonable probability will be sustained in the future Answer: $ 60,000.00

c. Loss of earnings in the past Answer: $ 1,130.58

d. Physical disfigurement in the past and that in reasonable probability will be sustained in the future Answer: $ 50,000.00

e. Medical care in the past Answer: $ 32,117.07

We first address Dico's contention regarding future damages. If an issue is properly pleaded and is supported by some evidence, a litigant is entitled to have controlling questions submitted to the jury. Tex.R. Civ. P. 278; *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex.1995). No complaint was raised about Cisneros' pleadings. Therefore, submission of a jury question on future damages was appropriate if supported by legally sufficient evidence.

 Witnesses present at the time of the accident testified that immediately after the explosion, Cisneros flew backwards and his face was bloody. Dr. Max Gouverne testified that when Cisneros arrived at the emergency room after the accident, he had lacerations to the lips that continued into the nose. His septum was traumatized and the alveolar ridge was fractured. In addition, Cisneros' front teeth were knocked out of their sockets and were merely hanging on by soft tissue. Dr. Gouverne attempted to manually push the teeth back into position, causing Cisneros great pain. An operation was performed to correct Cisneros' lip and nose lacerations and to wire his teeth in place with an arch bar. Dr. Gouverne stated that following the first surgery, Cisneros had unsightly scars on his nose. Subsequently, Dr. Gouverne performed w-scar revision surgery to improve the appearance of Cisneros' nose scars and a dermabrasion procedure on his septum so that his breathing could be improved. Photographs depicting Cisneros' appearance from the time he was treated in the emergency room until his final visit with Dr. Gouverne were admitted into evidence.

Cisneros testified that his dental work included root canals, a temporary bridge, and a permanent bridge to replace three or four teeth. He saw a neurologist with complaints of headaches and blurred vision. However, a CAT scan and an M.R.I. did not find anything wrong with Cisneros. An ear, nose, and throat specialist treated him for allergy symptoms which began after the accident and were caused by a deviated septum.

Dr. Gouverne testified that Cisneros will need lifetime maintenance on his bridgework and that Cisneros might develop sinus problems because of the septal plasty. At the time of trial, Cisneros continued to have a mild degree of deformity from the scar. In addition, Cisneros testified that he sees the scar every time he looks in the mirror. The record reflects that Cisneros incurred approximately $32,000.00 in medical expenses and $1,100.00 in lost wages.

Other evidence established that only a mild degree of scarring still remained. Dr. Gouverne testified that the injuries did not affect Cisneros' ability to work or the functioning of his body. Testimony from Luis Santos, a Creager co-worker, indicated that Cisneros was able to play softball within a couple of weeks after the operation.

 Conflicts in the evidence and inferences to be drawn from them are for the jury to resolve. *Hughes v. Thrash,* 832 S.W.2d 779, 786 (Tex.App.—Houston [1st Dist.] 1992, no writ); *see Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988). When the elements of damages considered by the jury include the more amorphous, discretionary damages, such as mental anguish, pain and suffering, physical impairment, and disfigurement, any amount awarded above the more definitive past medical expenses and lost wages will be left to the discretion of the

jury. *Zrubeck,* 850 S.W.2d at 589. The determination of the amount of money that will compensate the plaintiff for physical injuries, impairment, and mental anguish involves a consideration of elements for which no mathematical standard exists except what an honest or impartial jury may deem adequate. *Texas Health Enter., Inc. v. Krell,* 828 S.W.2d 192, 201 (Tex.App.—Corpus Christi 1992), *vacated,* 830 S.W.2d 922 (Tex.1992). Unless the award is so large as to indicate that it was influenced by passion, prejudice, or other improper motive the jury verdict will not be set aside. *Id.*

We hold that the evidence is legally and factually sufficient to support the jury's findings on damages. The evidence is also legally sufficient to establish future mental anguish and physical disfigurement.

We conclude that the award was not so large as to indicate that the jury was improperly influenced. We hold that the trial court did not err in refusing to disregard the jury's findings on Questions 5(a), (b), and (d).

Dico argues that because Cisneros failed to separate accrued damages from his future damages, he is not entitled to recover those elements of damages. To support this argument, Dico relies on *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex. 1985). This reliance, however, is misplaced. The issue in *Cavnar* was prejudgment interest, not recovery of past or future damages. *Id.* at 556. Dico cites no other authority in support of its argument.

Dico also contends that appellee's counsel asserted that Cisneros was not seeking future damages. Dico's brief fails to state where in the record we may find these assertions. After reviewing the record, we only find that Cisneros was not seeking damages for lost earning capacity, an issue which was not submitted to the jury. We overrule Dico's 8th, 9th, 10th, 11th and 12th points of error.

By its fourteenth point of error, Dico complains that the trial court erred by entering a judgment that Cisneros recover separate amounts for physical pain, mental anguish, and physical disfigurement because such a judgment allows Cisneros a double recovery. We hold that Dico has waived this complaint because the issue was never raised in trial court and because Dico's brief provides no argument or authority. Tex.R.App. P. 52(a) & 74(f); *Victoria Bank & Trust Co. v. Brady,* 779 S.W.2d 893, 907–08 (Tex. App.—Corpus Christi 1989), *rev'd in part on other grounds,* 811 S.W.2d 931 (Tex.1991). We overrule Dico's 14th point of error.

### 3. CISNEROS' NEGLIGENCE

By its sixth and seventh points of error, Dico complains that the trial court erred in refusing to disregard the jury's response to Questions 1(b) and 4(c). Dico contends that Cisneros was negligent as a matter of law and that the overwhelming weight and preponderance of the evidence shows such negligence proximately caused his injuries. Dico also contends that the evidence is legally and factually sufficient to show that the percentage of causation attributable to Cisneros was greater than zero.

Dico raised Cisneros' negligence as a defense and, therefore, had the burden of proof on the issue. When a party with the burden of proof complains on appeal from an adverse jury finding, the appropriate points of error are "that the matter was established as a matter of law" or "that the jury's finding was against the great weight and preponderance of the evidence." *Croucher,* 660 S.W.2d at 58.

When we review a legal sufficiency or "that the matter was established as a matter of law" point of error, we examine the record for evidence supporting the finding of fact and ignore all evidence to the contrary. *Sterner v. Marathon,* 767 S.W.2d 686, 690 (Tex.1989); *Hickey v. Couchman,* 797 S.W.2d 103, 109 (Tex.App.—Corpus Christi 1990, writ denied). If we find that no evidence supports the finding, we must determine from the record whether the contrary proposition is established as a matter of law. *Sterner,* 767 S.W.2d at 690; *Hickey,* 797 S.W.2d at 109.

When we review a factual sufficiency or "against the great weight and preponderance of the evidence" point of error, we examine the entire record. *Cain v. Bain,* 709 S.W.2d

175, 176 (Tex.1986); *Hickey,* 797 S.W.2d at 110. We set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain,* 709 S.W.2d at 176; *Hickey,* 797 S.W.2d at 110.

In order to prove the plaintiff's negligence, the defendant must establish that the plaintiff failed to use ordinary care to do or not do that which a person of ordinary prudence would have done or not done under the same or similar circumstances. *Parker v. Highland Park, Inc.,* 565 S.W.2d 512, 520 (Tex.1978); *Terminix, Inc. v. Right Away Foods Corp.,* 771 S.W.2d 675, 682 (Tex. App.—Corpus Christi 1989, writ denied). It requires a knowledge and appreciation on the plaintiff's part of the danger to be encountered. *Terminix,* 771 S.W.2d at 682. However, one's conduct in proceeding after having knowledge of the danger is not always negligent. *Id.* There are other considerations such as the nature of the danger, the alternatives available, and the precautions taken which bear upon the reasonableness of the actions. *Parker,* 565 S.W.2d at 520; *Terminix,* 771 S.W.2d at 682.

Cisneros claimed in his initial accident report that he was injured when the tire exploded while he was inflating the tire. At trial, however, Cisneros testified that he meant the explosion occurred after he finished putting air in the tire. Other testimony indicated that within two months after the accident, Ricardo Martinez, assistant service manager for Creager Tire, told an investigator that the tire exploded as Cisneros bent over to pick it up.

Cisneros claimed that he washed the tire and the wheel with a soap solution prior to remounting the tire. He testified that the bead appeared to be seated before the tire was inflated with thirty-five pounds of air pressure. Harm and Walker agreed that the bead could seat away from the flange. Harm also explained that the bead could appear to be properly seated if the sidewall moved up to the flange and hid the bead. Cisneros claimed that he was sure of the air pressure because he relied on the gauge connected to the air compressor and on his own pocket gauges.

Although the tire was standing on its tread during inflation, testimony indicated that this was not an improper procedure. Cisneros claimed that after the tire was inflated, he went to his truck to retrieve a valve cap. As he walked away from the tire, it fell flat on the ground with the valve stem up. The cap was placed on the valve stem, and then the tire exploded as Cisneros bent over to pick it up. According to testimony, the only way the tire could have been propelled into Cisneros' face is if air pressure was suddenly expelled against something, such as the ground. This testimony seems to support Cisneros' claim that he had finished inflating the tire. Cisneros stated that, in his seven years as a tireman, he had never had a tire explode.

Cisneros admitted that he was not using the protective restraining device available on his truck. He stated, however, that he was told to use the device when working on multi-piece rims rather than the single piece at issue. There was testimony that the protective restraining device would have been removed at the point when Cisneros was ready to put the tire and wheel assembly back on the front-end loader.

We find the above to be some evidence that Cisneros was not negligent. He cleaned the tire and wheel, used gauges, and checked the bead for seating. Although he did not use the restraining device, the tire exploded at the point when the restraining device would have been off the tire. Because this is some evidence to support the jury's verdict, we cannot say that Cisneros was negligent as a matter of law. We also conclude that the jury's finding was not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

Dico contends that Cisneros was negligent because (1) he did not properly clean the tire and wheel assembly, (2) he failed to use air pressure gauges, (3) he failed to use a restraining device, (4) he failed to use a clip-on air chuck, and (5) he failed to check the tire for proper bead seating.

Although Walker claimed the tire and wheel were dirty when he received them for

testing, the testimony showed that there was soap on the tire and wheel when Creager employees took the items back to the shop after the accident. Walker stated that the proper way to clean the wheel was with a wire brush. However, the tire was remounted on the wheel assembly several times by Creager and Dico employees before Walker's inspection, and the items had not been cleaned in that manner. Apparently none of the tiremen who worked with the tire and wheel assembly followed the cleaning procedures prescribed by Walker.

Creager employees testified that the inline pressure gauge was not attached to the compressor when Cisneros' truck was inspected. They found this gauge wrapped up and under the front seat of Cisneros' truck. Cisneros was not asked whether he had removed this gauge from the compressor hose. A hand-held gauge was found in the back of the truck under other equipment, and Creager employees said it looked like it had not been used recently. No one could remember whether Cisneros had a gauge in his pocket after the accident. Other testimony indicated that the truck's tailgate was covered with tools when Creager workers were ready to move it back to the shop. The workers merely closed the tailgate, dumping the tools into the truck's bed. Dico made no claim that the tire exploded because it was overinflated.

Cisneros admitted to not using a restraining device or a clip-on air chuck. Evidence indicated that the restraining device would prevent a tire from exploding while the tire was being inflated. However, as we stated above, the device would be removed from the tire prior to remounting it on the vehicle. Using the clip-on air chuck would have allowed Cisneros to stand clear of the tire during inflation. Cisneros claimed the tire exploded after the inflation process was completed and just as he was preparing to remount the tire and wheel assembly onto the front-end loader. Thus, it is not apparent that the air chuck or the restraining device would have prevented this accident. Because this is some evidence to support the jury's verdict, we cannot say that Cisneros was negligent as a matter of law.

Finally, Dico contends that alcohol may have been a factor in the accident. However, the jury did not hear any alcohol-related evidence. For this reason and those discussed above, we conclude that the jury's finding that Cisneros was not negligent was not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. We hold that the trial court did not err in refusing to disregard the responses to Questions 1(b) and 4(c). We overrule Dico's 6th and 7th points of error.

### 4. EXCLUSION OF EVIDENCE

By its thirteenth point of error, Dico complains of the trial court's refusal to permit Cisneros to be cross-examined on the issue of his alcoholism. Dico contends that this testimony was material to the issues of causation, damages, and credibility. Dico argues that because the jury did not hear the testimony, it heard only a partial story of the accident. In addition, Dico complains that it was ordered by the trial court not to pursue questioning regarding Cisneros' alcoholism.

After reviewing the record, we conclude that Dico did not preserve this complaint for appeal. Dico never attempted to question Cisneros about alcohol-related issues. The only mention of alcohol occurred during a conference away from the jury and was in connection with Cisneros' history of driving while intoxicated. The conference took place after Dico began questioning Cisneros about his interrogatory responses. At the outset of the conference, Dico stated that it was not attempting to introduce evidence of the DWIs.

Eventually Dico tried to convince the trial court that the DWI evidence was relevant to the discrepancy between Cisneros' interrogatory and deposition responses. These answers apparently gave conflicting reasons for Cisneros' termination from Creager. However, the termination was unrelated to the accident, and Dico did not explain how this information undermined Cisneros' credibility as a witness to the accident. Moreover, Dico made no claim that such information was relevant to the issues of causation and dam-

ages. At this point in the trial, there were no allegations, as there are on appeal, that Cisneros had alcohol in his blood system when he was injured.

Additionally, we are unable to find in the record where the trial court ordered Dico not to pursue the issue of alcoholism or the DWIs. At the end of the conference, the trial court stated:

> I still am of the same opinion about the D.W.I., I don't think we should go into that yet, and if at all.

> On the business about the interrogs and the answers, I think I will let you ask him why he gave different answers. But I think I am kind of waiting to see what his answer is. We will see where he goes from there, and I don't think that's a big deal, but I think you can go into that.

These remarks indicate that the trial court had not completely closed the issue of the DWIs. However, Dico made no further attempts to offer alcohol-related evidence during the remainder of the trial.

Dico's reliance on *Foster v. Bailey*, 691 S.W.2d 801 (Tex.App.—Houston [1st Dist.] 1985, no writ), in support of its claim that error was preserved, is misplaced. In *Foster*, the appellant offered evidence and obtained an adverse ruling but failed to make a bill of exceptions. *Id.* at 802–03. The court held that cross-examination of the sole adverse party on an ultimate disputed issue did not depend on a showing that such examination would be successful. *Id.* at 803. Thus, appellant had not waived error by failing to make a bill of exceptions. *Id.*

In the case before us, Dico failed to preserve error because it did not offer evidence or obtain an adverse ruling and thus, was not denied the opportunity to cross-examine Cisneros on an ultimate disputed issue. *See id; Johnson v. Garza*, 884 S.W.2d 831, 834 (Tex.App.—Austin 1994, writ denied); *Roberts v. Tatum*, 575 S.W.2d 138, 144 (Tex.Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.). We overrule Dico's 13th point of error.

### 5. JURY CHARGE

By its fifteenth point of error, Dico complains that the trial court erred in submitting Question 4 because it did not allow for apportionment of Creager's responsibility for the accident. Dico contends that it was denied a properly requested submission of a vital defensive issue which was raised by the pleadings and evidence. Specifically, Dico contends that the pleadings and evidence established that Creager's negligence caused Cisneros' injuries, in whole or in part.

 Although Dico objected to Question 4 because of the omission, a comparative responsibility question submitted by Dico did not include Creager. A party may not invite error by tendering a request and then objecting to its submission. *General Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993).

Moreover, Question 4 asked the jury to apportion the responsibility for each person it found to have caused the accident. The jury did not find that Creager's conduct caused the accident because Creager was not included in Question 1 which dealt with negligence and proximate cause. Also, the negligence question submitted by Dico did not inquire about Creager's negligence. In addition, Dico raised no objection to Question 1, nor does Dico claim on appeal that the issue was conclusively proven, thus precluding the need for a jury question. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222–23 (Tex.1992); *Wyndham Hotel Co. v. Self*, 893 S.W.2d 630, 635–36 (Tex.App.— Corpus Christi 1994, writ denied); *Gilgon, Inc. v. Hart*, 893 S.W.2d 562, 567–69 (Tex. App.—Corpus Christi 1994, writ denied). Therefore, even if Creager had been included in Question 4, the jury could not have apportioned responsibility without a finding that Creager's negligence caused the accident.

Dico also argues that Creager was a settling person as defined by Chapter 33 of the Texas Civil Practice & Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.011(5) (Vernon Supp.1996). Section 33.003 requires that the trier of fact determine the percentage of responsibility for each claimant, defendant, and settling person. TEX. CIV. PRAC. & REM.CODE ANN. § 33.003 (Vernon Supp. 1996). A review of the record indicates that Dico did not object to Question 4 on these grounds and there is no evidence that Creag-

er was a settling person. We hold that Dico waived error on this claim. We overrule Dico's 15th point of error.

By its sixteenth point of error, Dico contends that the trial court erred by holding that, as a matter of law, Creager was not responsible for the accident. We find no such holding in the record, and Dico failed to argue or cite authorities for this point. TEX. R.APP. P. 74(f). We overrule Dico's 16th point of error.

By the following points of error, Dico also contends that the trial court erred in submitting Question 4 because:

Point 17 it did not allow Cisneros to obtain a proper causation finding;

Point 18 it deviated from § 71.12 of the Texas Pattern Jury Charges;

Point 19 it deviated from Chapter 33 of the TEX. CIV. PRAC. & REM.CODE;

Point 20 the answer failed to total 100% for each legal theory; .

Point 21 the question was inherently vague, confusing, erroneous, contradictory and conflicting;

Point 22 it gave plaintiff "two bites at the apple," diverted jury attention from pivotal issues, and constituted a comment on the weight of the evidence;

Point 23 it was an improper question on comparative responsibility; and,

Point 24 it was not the question submitted by Dico.

Cisneros argues that Dico did not preserve this error because of conflicting objections. We find this argument to be without merit. During the charge conference, Dico stated that the name of the manufacturer and the name of the product should be confined to one inquiry. Dico asked that Question 4 be amended to read Dico Tire, Inc. and/or the tire or to totally exclude a reference to the tire. Everyone agreed with the first choice and the change was made. When the trial court asked Dico for its objections to the charge, Dico stated:

Further, Your Honor, it inquires only as to Dico Tire, Inc., the tire as jointly and/or and Mr. Cisneros, it leaves out E.B. Creager Tire and Battery, Inc., Cisneros' employer at the time of the accident. There was evidence as to the training that he received or did not receive at Creager Tire. Creager Tire should be included as a party among whom to spread the responsibility[.]

The only other complaint Dico made regarding Question 4 was that it was multifarious because several theories of recovery were combined in one question. Dico contended that such a combination could not be used because different bars to recovery applied in negligence and products liability cases.

For some reason, Cisneros believed that Dico was objecting to including the manufacturer and the tire within one inquiry. Dico urged the court to allow separate inquiries for Dico and the tire. The trial court sustained Dico's original objection which had nothing to do with the format of the question other than that Creager was omitted. The question was then written as follows:

If, in answers to Questions Nos. 1, 2, and/or 3, you have found that the negligence of more than one of the parties and or one or more defects in the tire caused the occurrence, then answer Question No. 4. Otherwise, do not answer Question No. 4. .

*QUESTION NO. 4*

For each person or product found by you to have caused the occurrence, find the percentage caused by each.

The percentages you find must total one hundred percent. The percentage of causation attributable to a person or product is not necessarily measured by the number of act, omissions or product defects found.

a. Dico Tire, Inc. acting by and through its agents, employees or representatives — Answer: 80%

b. The tire in question — Answer: 20%

c. Roger D. Cisneros — Answer: 0%

Dico's subsequent objection was overruled.

■ The standard of review for an alleged error in the jury charge is abuse of discretion. *Texas Dept. of Human Serv. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). An abuse of discretion occurs when the trial court acts without reference to any guiding principal. *Id.*

■ Dico contends that the trial court committed reversible error by submitting Question 4 because it did not comply with section 71.12 of the Texas Pattern Jury Charges ("PJC"). Specifically, Dico complains that pursuant to the PJC, the court should have submitted the manufacturer and the tire as one comparative responsibility inquiry rather than two. We note, however, that though the PJC provides an excellent aid and guide in formulating jury issues and instructions, it is not intended to set forth the only language that may be appropriate on a given issue. *See Texas Employers Ins. Ass'n v. Duree*, 798 S.W.2d 406, 413 (Tex. App.—Fort Worth 1990, writ denied); *Murphy v. Waldrip*, 692 S.W.2d 584, 592 (Tex. App.—Fort Worth 1985, writ ref'd n.r.e.). Even in cases where the Texas Supreme Court has found error in the alterations to the PJC, the trial court was reversed only when the error was harmful, *see Acord v. General Motors Corp.*, 669 S.W.2d 111, 114 (Tex.1984); *see also Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756 (Tex.1995), or the changed language was an incorrect statement of law, *see Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex.1984). We hold that the question, as amended, is not an incorrect statement of the law, and if the submission was error, it was harmless.

If this case had been grounded solely on pleadings of products liability, the proper question could have inquired about the responsibility of the tire only. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 427 n. 8 (Tex.1984); 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 71.12 (1994). An inquiry about Dico's conduct or fault would have been improper. *Duncan*, 665 S.W.2d at 427. Although commentators to section 71.12 of the PJC suggest that for a case grounded in both negligence and prod-

ucts liability, the appropriate comparative responsibility question would include the manufacturer and the product in one inquiry, *see* PJC 71.12 comment, we fail to see, how in this case, separate inquiries led to improper findings or an incorrect judgment.

Under the negligence question submitted, the jury found that Dico was negligent while Cisneros was not. In addition, the jury found that the tire was defectively designed and manufactured, and that the defect existed before the tire left Dico's possession. The jury found in Question 4 that the percentage of responsibility was: Dico—80%, the tire—20%, and Cisneros—0%. The pleadings, findings, and evidence in this case allowed the trial court to attribute to Dico any responsibility assigned to the tire. Thus, Dico's total responsibility was 100%. Had the court submitted the question with Dico and the tire in one inquiry, the jury's response would have been 100%. Regardless of how the comparative responsibility questions might have been worded in this case, the findings for Questions 1 through 3 and the evidence presented precluded any other apportionment of responsibility but 100% for Dico.

Dico also contends that the trial court erred by deviating from § 33.003 which requires that the fact finder determine the percentage of responsibility for each claimant, defendant, and settling person. TEX. CIV. PRAC. & REM.CODE ANN. § 33.003 (Vernon Supp.1996). According to Dico, § 33.003 mandates that the manufacturer and the tire be submitted as one inquiry. However, § 33.003 does not provide a specific format for jury charge questions. The section merely states how responsibility is to be apportioned.

Dico further contends that Question 4 was inherently vague, confusing, erroneous, contradictory, and conflicting. In addition, Dico argues that the question distracted the jury from the pivotal issues and was a comment on the weight of the evidence. However, with the exception of separate inquiries for Dico and the tire, the question submitted is substantially the same as section 71.12 of the

PJC which Dico relies on to support its claim of error. Dico does not explain how the trial court's question is problematic while section 71.12 is not.

■ As to Dico's complaint that the trial court erred by not submitting the question in the form as provided by Dico. Dico's written request did not include a mention of the tire, either as a separate inquiry or in combination with the manufacturer. Although this request would be correct in a negligence case, we conclude that such a question was not proper here because it failed to address the products liability claims.

For the reasons discussed above, we hold that the trial court did not abuse its discretion by submitting Question 4 to the jury. We overrule Dico's 17th, 18th, 19th, 20th, 21st, 22nd, 23rd, and 24th points of error.

## 6. PREJUDGMENT INTEREST

By its twenty-sixth point of error, Dico contends that the trial court erred in awarding Cisneros prejudgment interest for future mental anguish and future disfigurement. By the following points of error, Dico contends that:

- Point 27 prejudgment interest on future damages violates the due process provisions of the federal and state constitutions;
- Point 28 prejudgment interest on future damages violates the equal protection provisions of the federal and state constitutions;
- Point 29 prejudgment interest on future damages constitutes an excessive fine in violation of the federal and state constitutions; and
- Point 30 prejudgment interest on future damages constitutes usurious and excessive interest in violation of state law.

In *C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315 (Tex.1994), the supreme court held that under Texas law prejudgment interest is allowed on future damages. *Id.* at 324. Additionally, the court found that such interest does not violate the due process guarantees of the federal and state constitutions. *Id.* at 327. Moreover, at least one appellate court has considered complaints similar to Dico's other constitutional and statutory claims. *See Ellis County State Bank v. Keever*, 870 S.W.2d 63, 72–73 (Tex. App.—Dallas 1992), *aff'd in part, rev'd in part on other grounds*, 888 S.W.2d 790 (Tex. 1994).

■ The Dallas Court found that assessing prejudgment interest on future damages did not violate the Equal Protection Clause of the Texas Constitution because such assessment was rationally related to the state's interest in fairness and encouragement of settlements in personal injury causes of action. *Id.* at 73. In addition, the court found that the legislatively-prescribed prejudgment interest did not manifestly violate the constitutional ban on excessive fines. *Id.* This is the only reason a court should overrule a legislatively prescribed fine. *Id.* The court also determined that such interest is not usurious because the Texas Legislature provided for prejudgment interest in TEX.REV. CIV. STAT. ANN. art. 5069–1.05, § 6(a). *Id.* We agree with our sister court and hold that prejudgment interest does not violate Dico's equal protection rights, is not an excessive fine, and is not usurious. Dico provides no argument or authorities to support its remaining constitutional complaints regarding prejudgment interest.

We hold that the trial court did not err in awarding Cisneros prejudgment interest for future mental anguish and future disfigurement. We overrule Dico's 26th, 27th, 28th, 29th, and 30th points of error.

## 7. IMPROPER JURY ARGUMENT

Dico's twenty-fifth point of error alleges that the trial court erred in refusing to declare a mistrial because Cisneros' counsel presented incurable jury argument. Dico complains of one paragraph in counsel's argument which states as follows:

Common sense also tells you about the damages. The evidence is Mr. Cisneros is going to have to look in that mirror for the rest of his life. And if he thought—if he could think that it was his fault, he could look in the mirror and shake his head and say, "I shouldn't have done it that way." But instead, he has to look in that mirror

and say, "Dico Tire, Inc., did this to me." and whether or not there is a burning rage in that man, that Dico Tire did this to him, rests in your hands. Because if we don't have a civil justice system to do what you need to do, that burning rage starts to get out of control and people start to take the law into their own hands. You-all serve the purpose of diffusing some of that rage. And if you do it right, Mr. Cisneros won't have to have so much rage as he goes year, after year, after year knowing about this Dico tire.

Dico complains that this commentary "threatened the jury with a sinister ultimatum: give his client money to subdue his unsatisfied rage or be forever responsible for any violence against the community should his client be forced to seek retribution outside the legal process." Dico did not object, request an instruction to disregard, or move for mistrial at the time of the argument. After the jury retired for deliberations, however, Dico did move for a mistrial. Dico contends that the argument was incurable, whether an objection was sustained or not.

Only rarely will an improper argument so prejudicially influence the jury that the harm cannot be cured. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex.1979); *Cecil v. T.M.E. Inv., Inc.*, 893 S.W.2d 38, 48 (Tex.App.—Corpus Christi 1994, no writ). By failing to lodge a contemporaneous complaint to Cisneros' argument, Dico has waived the right to protest any error that might have been cured at the time. *See Standard Fire*, 584 S.W.2d at 841; *Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex.1968); *Cecil*, 893 S.W.2d at 48. Consequently, we must examine the record to determine whether an instruction to disregard the argument and/or a reprimand by the trial judge would have sufficiently remedied any harm. *See Standard Fire*, 584 S.W.2d at 839; *Cecil*, 893 S.W.2d at 49.

The complained-of portion of counsel's argument was brief and not evident during any other part of the trial. *See Standard Fire*, 584 S.W.2d at 839–40. The major theme of the complained-of portion of counsel's argument deals with the mental anguish Cisneros faces on a daily basis because of the visible reminder of the accident. The jury saw pictures of Cisneros which were taken immediately after the accident and during his recovery. They also observed his physical appearance during the trial. Counsel was correct in stating that the purpose of the civil justice system is to prevent injured persons from taking matters into their own hands and in reminding the jury that they are part of that system.

After examining the record, we conclude that any impropriety in counsel's argument could have been cured by instructions to the jury to disregard counsel's comments and to remember the evidence. In addition, the trial court could have admonished counsel to stick to the evidence rather than play on emotions. A considerable amount of evidence was presented to support the theories of each side. The jury was able to watch Cisneros' demeanor while this evidence was presented and during his testimony. Nothing in the record indicates that Cisneros was angry or vengeful before or during the trial. Because any harm caused by jury argument could have been cured, we hold that Dico waived error. We overrule Dico's 25th point of error.

We affirm the judgment of the trial court.