**HEALTHCARE CENTERS OF TEXAS, INC. d/b/a the Laporte Healthcare Center, Appellant,**

v.

**Virginia Martine RIGBY, Individually and as Administratrix of the Estate of Jewell Underwood, Deceased, Appellee.**

No. 14–00–00790–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 12, 2002.

Rehearing Overruled Feb. 13, 2003.

David B. Weinstein, Houston, Diana L. Faust, R. Brent Cooper, Dallas, for appellant.

**614**

Rusty Hardin, Timothy F. Lee, Houston, for appellee.

Panel consists of Chief Justice BRISTER and Justices FOWLER and SEYMORE.

### CORRECTED OPINION

CHARLES W. SEYMORE, Justice.

We withdraw our opinion of March 7, 2002 and issue this corrected opinion. Appellee's Motion For Rehearing is overruled.

Healthcare Centers of Texas d/b/a The LaPorte Healthcare Center appeals a judgment in favor of Virginia Martine Rigby on the following grounds: (1) exemplary damages are barred or capped by chapter 41 of the Texas Civil Practice and Remedies Code; (2) the evidence is legally and factually insufficient to support the jury's verdict on the cause of action for negligence; (3) the trial court failed to provide for segregation of exemplary damages in the jury charge; (4) the actual and exemplary damage awards were excessive; and (5) because of cumulative errors of law, Healthcare is entitled to a new trial in the interest of fairness and justice. The jury awarded Rigby $50 million in punitive damages and $5 million in actual damages. The trial judge remitted those amounts to $10 million and $1 million, respectively. Finding that Texas law prohibits punitive damages in this case, we vacate that portion of the court's judgment and affirm the remainder of the judgment.

### Facts

This case arises out of an attempted sexual assault by Morris Jones on Jewel Underwood while both were residents at LaPorte Healthcare Center. Jones was admitted to Anahuac Healthcare Center in December 1995. Anahuac and LaPorte are nursing homes owned by Healthcare Centers of Texas, Inc. By October 1996, Jones had begun to exhibit inappropriate behavior at the Anahuac facility. Nurses at Anahuac testified that Jones repeatedly sat in the public rooms of the nursing home with his pants unzipped and his penis out in front of other residents. Anahuac nursing home kept cats and kittens at its facility because it was thought that pets would be therapeutic for the residents. Nurses observed Jones several times on the patio outside the dining room using the cats as masturbation aids.

After observing several incidents of inappropriate behavior with cats, Joanne Mathis, a nurse at Anahuac, observed Jones attempting to sexually assault a male resident in a closed restroom. The resident was blind, disoriented, and suffered from Alzheimer's disease. Jones was also seen wandering into residents' rooms and closing their doors. When confronted with this aberrant behavior, Jones became angry and denied any wrongdoing. The daughter of a staff member reported that Jones tried to follow her into a linen closet. She stated that he pulled on the doorknob to get into the closet with her.

The overall belief of the nurses and staff at Anahuac was that Jones was a threat to other residents and should not be in a nursing home. Although the nurses attempted to monitor Jones more closely than other residents, there was not enough staff to fully protect other patients. Several staff members testified that it was foreseeable he would sexually assault an elderly, disabled resident. The day Jones was discharged from Anahuac, Alicia Morgan, the director of nursing, wrote on his chart, "This resident is at risk for harming others." The nurses repeatedly informed Dr. Keith Rapp of Jones's aberrant behavior. Dr. Rapp was the medical director of both the Anahuac and LaPorte Healthcare

Centers and the personal physician for Jones and Mrs. Underwood.

Dr. Kenneth Huff, a psychologist, was asked to evaluate and treat Jones for depression in April 1996. After two weeks, Dr. Rapp directed that Dr. Huff discontinue treatment, stating that Jones was no longer depressed. Dr. Huff later saw Jones on October 17, 1996, and diagnosed him as having major depression and sexual paraphilia, which Dr. Huff defined as, "sexual acting out." Dr. Huff's records contained observations of Jones's sexual impropriety with cats and expressed the concern that Jones may behave in a sexually inappropriate manner with low-functioning female residents. Dr. Huff concluded that Jones was "very dangerous" and needed to be placed in a more secure facility. Dr. Huff reported that a crisis atmosphere surrounding Jones had reached a crescendo by mid-October 1996. Dr. Huff reported that Jones's daughter wanted to get help for her father, but she could not bring him to her home because she could not trust him around small children.

On November 27, 1996, Jones was involuntarily committed to a psychiatric unit at San Jacinto Hospital. Dr. Wamble of San Jacinto Health Care Center wrote in Jones's chart that Jones "is likely to cause serious harm to others." On December 10, 1996, Dr. Wamble sought to discharge Jones from San Jacinto. The nursing home administrator and director of nursing at Anahuac sent Robin McDaniel, the assistant director of nursing at Anahuac, to San Jacinto to determine whether Jones could return to Anahuac. Mrs. McDaniel reviewed Jones's records and discovered that he had been videotaped masturbating in the open, had been verbally aggressive with the staff, and had been hoarding food in his room—all behaviors Jones had exhibited at Anahuac. Further, Jones propositioned a female staff member at San Jacinto for sex. Although Jones was taking medication, he continued to behave inappropriately at San Jacinto. Mrs. McDaniel concluded that Jones should not be placed in any nursing home and that he needed a more restrictive environment.

Anahuac refused to accept Jones from San Jacinto. Dr. Rapp then called Green Acres, another nursing home owned by Healthcare Centers of Texas where he was a medical director. The administrator at Green Acres reviewed Jones's records and refused to take him because he did not want that type of resident. Dr. Rapp then called Dorsey Greer, the administrator of LaPorte nursing home.

Dorsey Greer testified that Dr. Rapp told him he had a potential new resident for LaPorte who had been at Anahuac, then discharged to San Jacinto Hospital. Dr. Rapp told Greer that Anahuac had refused to accept Jones from San Jacinto. According to Greer's testimony, Dr. Rapp stated that Jones had been a model resident except for one incident of inappropriate sexual behavior with a cat. It was Dr. Rapp's opinion that the incident occurred because Jones did not take his medication. Greer testified that in admitting a new resident, it was his policy to review the records from the discharging institution and any other pertinent information about the resident. He would ordinarily send the director of nursing to the psychiatric hospital to review the records, but he did not do so in the case of Jones. Jones was admitted to LaPorte on December 12, 1996. Greer testified that had he known of Jones's history at Anahuac, he would have moved Jones closer to the nurses' station and would have discharged him "the first time he went near another person."

Two or three days after Jones's admission, Glenda Raglund, the quality assur-

ance nurse for Anahuac and LaPorte, learned Jones had been admitted to La-Porte. She immediately called Greer and asked him, "Why in the bleep did you let this person get into our facility?" She reported Jones's history at Anahuac and told Greer he should make arrangements to place Jones in a more secure facility as soon as possible. Greer began to explore alternatives for discharging Jones, however, pursuant to State regulations, Jones could not be discharged until he displayed aberrant behavior at LaPorte.

Greer instructed the director of nursing to meet with the nurses and require them to watch Jones closely. He instructed her not to tell the nurses about Jones's behavior at Anahuac because he did not want a "witch hunt." The director of nursing did not tell the nurses at LaPorte about Jones's behavior at Anahuac.

The nurses and nurses' aids at LaPorte began noticing Jones's behavior. They complained that he wandered into residents' rooms, urinated outdoors, became angry when he was asked to use the restroom indoors, and become angry when asked to take a shower. One nurse's aid testified that she had to ask for help to remove Jones from a female resident's room when she could not verbally persuade him to leave. Several LaPorte nurses testified that if they had known Jones was a safety threat, they would have moved him to a room much closer to the nurses' station and would have monitored him every fifteen minutes to protect other residents. Jones's room was at the end of the hall across from Mrs. Underwood's room, far from the nurses' station. A nurse at LaPorte reported to Greer and the director of nursing that Jones was frequently seen roaming into Mrs. Underwood's room.

Approximately ten days after Jones's admission to LaPorte, Terri Leakey, a nurse, found a piece of paper with Jones's name on it, three one dollar bills, and two pills on the right side of Mrs. Underwood's bed, below her pillow. Mrs. Leakey expressed concern because the note and money were on the side of the bed adjacent to the wall. Mrs. Leakey testified that Jones was too weak to move the bed and too short to reach over Mrs. Underwood. She reached the conclusion that Jones could have only reached that location by getting into Mrs. Underwood's bed. After reporting this incident to Greer and to the director of nursing, Leakey asked Greer if Jones could be moved to a room closer to the nursing station, but Greer refused.

Virginia Rigby testified that she placed her mother in LaPorte Healthcare Center in 1986. Mrs. Rigby visited her mother for several hours twice a day. By December 1996, Mrs. Underwood was blind and mostly deaf, but was alert and aware of her surroundings. On December 27, 1996, Mrs. Rigby discovered a one dollar bill under the covers of her mother's bed near her mother's waist. Mrs. Rigby took the money to the nurses' station because she thought one of the nurses might have dropped it. No one at LaPorte told Mrs. Rigby about previously finding money in her mother's bed.

On December 29, 1996, Mrs. Rigby visited her mother around 8:00 in the morning. After about an hour, she walked down the hall to get a cup of coffee. As she rounded the corner on her way back to the room, Mrs. Rigby heard her mother say, "Oh, oh." Mrs. Rigby testified that her mother sounded frightened. Mrs. Rigby ran to her mother's room and discovered Jones on top of her mother. Mrs. Rigby yelled for one of the nurses to help her. Annie Rivers, one of the nurses, and Mrs. Rigby pulled Jones off of Mrs. Underwood. Annie Rivers testified that when Jones was

on top of Mrs. Underwood, his penis was erect. After they pulled him off of her, his penis became flacid and was hanging out of his pajamas. Mrs. Underwood's gown had been pushed up around her neck, and she was wearing nothing underneath the gown. Jones was subsequently discharged to Rusk State Hospital.

Contrary to Greer's testimony, Dr. Rapp testified he fully informed Greer of Jones's history at Anahuac and at San Jacinto. Dr. Rapp testified he did not use the term "model resident," but told Greer there was a long period of time in which Jones did not exhibit unusual behavior. Dr. Rapp denied telling Greer that Jones's aberrant sexual behavior was a "one-time incident." Dr. Rapp encouraged Greer to call the director of nursing at Anahuac and inquire about Jones. Dr. Rapp testified he did not believe Jones was a safety risk when he entered LaPorte, nor was the assault on Mrs. Underwood foreseeable.

In its defense, LaPorte presented the deposition testimony of Virginia Rigby. Mrs. Rigby testified that prior to her death, Mrs. Underwood was blind for six months and had been deaf for two years. Mrs. Rigby testified that she did not seek a mental health professional after her mother's death. The assault on her mother caused Mrs. Rigby shock, but did not cause her any physical pain. Mrs. Rigby testified she suffered no disruption in her daily routine. On the day of the assault, she did not know if her mother understood what was happening. Mrs. Rigby further testified that, prior to the assault, her mother could communicate, either by squeezing her hand, or by speaking. After the assault, Mrs. Underwood did not communicate in any manner. Mrs. Rigby testified that she relived the assault in her mind "about a million times." She stated her mother changed for the worse and "just felt like everything was over."

The jury found LaPorte and Dr. Rapp were negligent and their negligence proximately caused harm to Mrs. Underwood and Mrs. Rigby. It further found that the harm sustained by Mrs. Underwood and Mrs. Rigby resulted from malice attributable to LaPorte and Dr. Rapp. The jury awarded Mrs. Rigby and Mrs. Underwood $2.5 million each in actual damages and assessed $50 million punitive damages against LaPorte. The trial court remitted actual damages to $500,000 each and punitive damages to $10 million.

## Punitive Damages

In its first issue, Healthcare claims section 41.005 of the Texas Civil Practice and Remedies Code bars an award of exemplary damages because Mrs. Rigby's and Mrs. Underwood's damages were caused by the criminal act of a third party, Jones. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.005 (Vernon 1997). Section 41.005, entitled "Harm Resulting from Criminal Act," provides:

(a) In an action arising from harm resulting from an assault, theft, or other criminal act, a court may not award exemplary damages against a defendant because of the criminal act of another.

(b) The exemption provided by Subsection (a) does not apply if:

(1) the criminal act was committed by an employee of the defendant;

(2) the defendant is criminally responsible as a party to the criminal act under the provisions of Chapter 7, Penal Code;

(3) the criminal act occurred at a location where, at the time of the criminal act, the defendant was maintaining a common nuisance under the provisions of Chapter 125, Civil Practice and Remedies Code, and had not made reason-

able attempts to abate the nuisance; or

(4) the criminal act resulted from the defendant's intentional or knowing violation of a statutory duty under Subchapter D, Chapter 92, Property Code, and the criminal act occurred after the statutory deadline for compliance with that duty.

(c) In an action arising out of a criminal act committed by an employee, the employer may be liable for punitive damages but only if:

(1) the principal authorized the doing and the manner of the act;

(2) the agent was unfit and the principal acted with malice in employing or retaining him;

(3) the agent was employed in a managerial capacity and was acting in the scope of employment; or

(4) the employer or a manager of the employer ratified or approved the act.

■ Section 41.005(a) bans punitive damages for the criminal conduct of another. It is undisputed that the direct cause of Mrs. Underwood's harm was the criminal conduct of another. Rigby argues that the court's charge allowed the jury to award punitive damages notwithstanding the concurrent criminal act of another. We disagree with Rigby's assertion for the following reasons. First, the injury to Mrs. Underwood was indivisible. We find it highly improbable that the jury awarded $50 million in punitive damages solely because of the criminal act of the nursing home, separate and apart from any criminal act by Jones. Second, in her sixth amended petition, plaintiff admits that the harm resulted from a criminal assault by Morris Jones. The trial court took judicial notice of the plaintiff's sixth amended petition. A judicial admission occurs when an assertion of fact is conclusively established

in live pleadings, making introduction of other pleadings or evidence unnecessary. *Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 767 (Tex.1983). A judicial admission not only relieves an adversary from introducing proof of the fact admitted but also bars the party from disputing it. *Gevinson v. Manhattan Constr. Co. of Okla.,* 449 S.W.2d 458, 466 (Tex.1969). Once a fact is conclusively established by judicial admission, jury questions concerning the fact need not be submitted. *See Chilton Ins. Co. v. Pate & Pate Enters., Inc.,* 930 S.W.2d 877, 884–886 (Tex.App.-San Antonio 1996, writ denied). After acknowledging plaintiff's judicial admission, we must determine whether Healthcare is exempt from liability for punitive damages under the provisions of Tex. Civ. & Rem. Code § 41.005.

■ Rigby further argues section 41.005 does not apply because the statute silently, but impliedly, allows recovery of punitive damages resulting from the defendant's conduct. We disagree with that assertion for the following reasons. First, our legislature enumerated and described four exceptions to a defendant's exemption from punitive damages because of the criminal act of another. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.005(b). In the instant case, there was no evidence that (1) the assault was committed by an employee of the defendant; (2) defendant (Healthcare) was criminally responsible as a party to the criminal act of assault under the provisions of Chapter 7, Penal Code; (3) the criminal act occurred at a location where, at the time, defendant was maintaining a common nuisance; or (4) the criminal act resulted from the defendant's violation of a duty under Subchapter D, Chapter 92, Property Code. There are no other exemptions. The legislature did not express that a defendant's concurrent criminal act (without criminal responsibili-

ty as a party under 41.005(b)(2)) constitutes an exception to statutory exemption from liability for punitive damages. We cannot add or create another exception to statutory exemption from punitive damages. It is a familiar rule of statutory construction that an exception makes plain the intent that the statute should apply in all cases not excepted. *State v. Richards,* 157 Tex. 166, 301 S.W.2d 597, 600 (1957); *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 681 (Tex.1998).

In responding affirmatively to jury question number six [1], the jury concluded that the harm to plaintiffs resulted from "malice" of Healthcare, by and through its "vice principal." The jury awarded $50,000,000 as exemplary damages in re-

sponse to question number eight.[2] Assessment of damages in question number eight was "for the conduct found in response to question number six." Question number six was posited such that the jury could not distinguish between the criminal act of Jones and malice attributed to Healthcare. Appellee contends the jury assessed punitive damages because of Healthcare's malice, not because of the criminal act of another. In interpreting or applying 41.005 to any scenario, it seems implicit that our legislature anticipated a jury might find a defendant acted with malice even though the harm to a plaintiff was caused by the criminal act of another. Because the plaintiff admitted her harm was

---

1. Do you find by clear and convincing evidence that the harm to Jewell Underwood or Virginia Rigby Patterson resulted from malice of Defendant Healthcare Centers of Texas, Ins. D/b/a the La Porte Healthcare Center?

 "Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

 "Malice" means:

 (a) a specific intent by Healthcare Centers of Texas, Inc. d/b/a The La Porte Healthcare Center to cause substantial injury to Jewell Underwood or Virginia Rigby Patterson; or

 (b) an act or omission by Healthcare Centers of Texas, Inc. d/b/a The La Porte Healthcare Center

 (I) which, when viewed objectively from the standpoint of Healthcare Centers of Texas, Inc. d/b/a The La Porte Healthcare Center at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm of others; and

 (ii) of which Healthcare Centers of Texas, Inc. d/b/a The La Porte Healthcare Center had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

 You are instructed that in order for Healthcare Centers of Texas, Inc. d/b/a The La Porte Healthcare Center to have acted with malice, you must find such specific intent or such act or omission was committed by a vice princi-

 pal of Healthcare Centers of Texas, Inc. d/b/a The La Porte Healthcare Center.

 A "vice principal" of a corporation is a person who has the authority to hire, discharge, and direct employees of the corporation or who has the authority to manage the entire corporation or a department or division of its business.

 [To which the jury answered, "yes".]

2. What sum of money, if any, should be assessed against Defendant Healthcare Centers of Texas, Inc. d/b/a The La Porte Healthcare Center and awarded to the Estate of Jewell Underwood and Virginia Rigby Patterson as exemplary damages for the conduct found in response to Question No. 6?

 "Exemplary damages" means any damages awarded as a penalty or by way of punishment. Exemplary damages include punitive damages.

 In determining the amount of exemplary damages you should consider evidence, if any, relating to:

 a. The nature of the wrong.

 b. The character of the conduct involved.

 c. The degree of culpability of the wrong-doer.

 d. The situation and sensibilities of the parties concerned.

 e. The extent to which such conduct offends a public sense of justice and propriety.
 Answer in dollars and cents, if any.
 [To which the jury answered "$50 mil".]

caused by the criminal conduct of Jones, she is barred from recovering exemplary damages under section 41.005 despite the jury's finding that Healthcare acted with malice. The affirmative finding of malice against Healthcare does not supercede the effect of appellant's judicial admission that Mrs. Underwood's harm was caused when she was assaulted by Morris Jones. *See Chilton Ins.*, 930 S.W.2d at 884–886; *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 905 (Tex.2000).

Appellee requested and the court submitted jury question number nine [3], which asked the jury to determine whether Healthcare's actions constituted the criminal act of injury to an elderly or disabled person. *See* Tex. Pen.Code Ann. § 22.04 (Vernon Supp.2002). We note that issue number nine was not submitted with correct definitions and instructions for corporate criminal responsibility, however, our interpretation of 41.005 renders this defect moot. We have concluded that the legislature did not provide an exception to exemption from punitive damages when a defendant commits a concurrent criminal act but is not responsible as a party. *See* Tex. Civ. Prac. & Rem.Code § 41.005(b)(2) Vernon Supp.2002.

Further, Section 41.005(b)(2) allows recovery of punitive damages if the defendant is criminally responsible as a party to the criminal act. By definition, if one can be responsible as a party, the act is a concurrent act. If we accept Rigby's construction of section 41.005, section (b)(2) would become a nullity. We cannot glean any different application of this statute under these facts because the physical and emotional injury to plaintiffs was caused by an assault committed by another party.

"It is the duty of the court to administer the law as it is written, and not to make law; and however harsh a statute may seem to be, or whatever may seem to be its omission, courts cannot ... make it apply to cases to which it does not apply, without assuming functions that pertain to the legislative department of the government." *Turner v. Cross,* 83 Tex. 218, 224, 18 S.W. 578, 579 (1892). We recognize this is a case of first impression with regard to interpretation of section 41.005. Finding no ambiguity in the statute, we hold section 41.005 bars plaintiff's recovery of punitive damages notwithstanding the affirmative answers to jury questions numbered six and nine. Healthcare's first issue is sustained.

**3.** Do you find that the conduct you have found to be malice was a knowing injury to an elderly or disabled individual?

A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person commits knowing injury to an elderly or disabled individual if he knowingly by act, or knowingly by omission, causes to an elderly or disabled individual:

A. serious bodily injury;
B. serious mental deficiency, impairment, or injury; or
C. bodily injury.

An omission that causes a condition described by (1) through (3) above is injury to an elderly or disabled individual if:

1. the actor has a legal or statutory duty to act; or
2. the actor has assumed care, custody, or control of an elderly or disabled individual.

"Bodily injury" means physical pain, illness, or any impairment or physical condition.

"Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

Answer "Yes" or "No" for each of the following:

Healthcare Centers of Texas, Inc. d/b/a The La Porte Healthcare Center

Dr. Keith Rapp

[To which the jury answered "yes" for both.]

Healthcare next contends the jury's finding of malice is not supported by sufficient evidence. In its second and third issues, Healthcare challenges the assessment and amount of punitive damages. The jury finding that Healthcare Centers, through its vice-principal, acted with malice could entitle the plaintiff to a recovery of punitive damages. *See Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex.1998) (holding that a corporation can be liable for punitive damages if it commits gross negligence or malice through the actions or inactions of a vice-principal). Because section 41.005 bars recovery of punitive damages despite the jury finding of malice, we need not address the sufficiency of the evidence to support the malice finding or the amount of punitive damages. See *Cf. Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994) (When confronted with a challenge to the factual sufficiency of evidence of an exemplary damages award, the court of appeals must detail the relevant evidence in support of or against the award).

### Bystander Recovery

In its fourth issue, Healthcare first contends that Mrs. Rigby's recovery for bystander injuries is precluded by the Medical Liability Insurance Act. *See* Tex.Rev. Civ. Stat. Ann. art. 4590i (Vernon Supp. 2002). The MLIA was enacted to alleviate a perceived medical malpractice insurance crisis by reforming health care liability laws to ensure affordable health care by reducing medical malpractice insurance rates. *See id.* § 1.02(a)(5), (b). The act applies only to a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, health care, or safety that proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract.

*Id.* § 1.03(a)(4). The definition of health care provider includes a nursing home. *Id.* § 1.03(a)(3).

In holding that a bystander could not recover in a medical malpractice case, the Supreme Court stated:

The very nature of medical treatment is often traumatic to the layperson. Even when a medical procedure proves to be beneficial to the patient, it may shock the senses of the ordinary bystander who witnesses it. A bystander may not be able to distinguish between medical treatment that helps the patient and conduct that is harmful. A physician's primary duty is to the patient, not to the patient's relatives. Guided by these policy concerns, we hold that Texas'[s] bystander cause of action precludes bystander recovery in medical malpractice cases.

*Edinburg Hosp. Auth. v. Trevino,* 941 S.W.2d 76, 81 (Tex.1997). The event that Mrs. Rigby witnessed was not a medical procedure being administered by a member of LaPorte's staff. Therefore, this is not the type of case the court contemplated when it precluded bystander recovery under the MLIA. *See generally* art. 4590i.

■ Healthcare contends the plaintiff's suit for LaPorte's failure to protect Mrs. Underwood from Mr. Jones amounts to a "claimed departure from accepted standards of . . . safety," and is within the definition of medical malpractice. The word "safety," however, cannot be read in isolation, and the phrase "accepted standard of . . . safety" must be read in context to mean "accepted standard of safety within the health care industry." *See Rogers v. Crossroads Nursing Serv., Inc.,* 13 S.W.3d 417, 418–19 (Tex.App.-Corpus Christi 1999, no pet.). Because the issue of protecting Mrs. Underwood from Mr. Jones is not governed by an accepted stan-

dard of safety within the health care industry, but rather is governed by the standard of ordinary care, the plaintiff's cause of action is one of simple negligence not governed by article 4590i. In this case, Mrs. Rigby sued Healthcare and others for simple negligence in failing to take adequate safety measures to protect its residents from a known sexual deviant. Therefore, article 4590i does not preclude Mrs. Rigby's bystander damages. *See Sisters of Charity of Incarnate Word v. Gobert*, 992 S.W.2d 25, 28 (Tex.App.-Houston [1st Dist.] 1997, no pet) (holding that cause of action was one of ordinary negligence rather than malpractice where plaintiff was sexually assaulted by another patient).

■ Healthcare next contends that Mrs. Rigby cannot recover bystander damages because Mrs. Underwood did not suffer "serious bodily injury." A bystander who witnesses a negligently inflicted serious or fatal injury may recover for mental anguish if (1) the bystander was located near the scene of the accident as contrasted with one who was a distance away from it; (2) the shock resulted from a direct emotional impact upon the bystander from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) the bystander and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. *Hermann Hosp. v. Martinez*, 990 S.W.2d 476, 478 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Healthcare does not challenge the fact that Mrs. Rigby was located near the scene of the assault, that she experienced shock as a direct result of contemporaneous observance of the assault, or that Mrs. Rigby and Mrs. Underwood were closely related. Healthcare claims that Mrs. Rigby cannot recover because her mother did not suffer serious bodily injury from the attempted sexual assault. Healthcare dwells on the fact that Mrs. Underwood was not physically injured. Physical injury, however, is not required for bystander recovery.

■ Healthcare argues that "[m]ost bystander cases involve contemporaneous perception by a close relative of injuries resulting in death, serious bodily injuries . . . or other permanently disabling injury." Healthcare does not cite and we have not found a case where the court required physical injury by the complainant prerequisite to recovery to recover mental anguish damages. In recognizing a bystander cause of action, the Supreme Court has found, "Before a bystander may recover, he or she must establish that the defendant has negligently inflicted serious or fatal injuries on the primary victim." *Boyles v. Kerr*, 855 S.W.2d 593, 598 (Tex. 1993). The Supreme Court has not recognized a requirement of physical injury.

In determining whether Mrs. Underwood suffered serious injury, we review the events Mrs. Rigby witnessed. Those events were of such a shocking and disturbing nature that mental anguish was a highly foreseeable result. As previously noted, after hearing her mother yell from down the hall, Mrs. Rigby witnessed Jones lying on top of her mother with her mother's clothing pulled up around her neck. Mrs. Rigby was forced to, with the help of a nurse, physically pull Jones off of her mother. Jones, when pulled off of Mrs. Underwood, stated, "You didn't let me get a chance to put it in yet." The very occurrence of this event establishes the emotional pain, torment, and suffering which were submitted to the jury. *See Fort Worth Cab & Baggage Co. v. Salinas*, 735 S.W.2d 303, 305 (Tex.App.-Fort Worth 1987, no writ) (stating that although mother did not suffer physical injury from sexu-

al assault, children who witnessed assault could recover mental anguish damages as bystanders). Therefore, Mrs. Rigby is entitled to recover damages as a bystander.

### Recovery for Pain and Mental Anguish

 Healthcare next contends that Mrs. Underwood could not recover for physical pain and mental anguish because she could not cognitively experience it. Healthcare contends there is no evidence that Mrs. Underwood was aware of Jones's attack or that she could mentally contemplate any harm to herself resulting from Jones's conduct. Healthcare argues that because Mrs. Underwood did not cry, yell, scream, or thrash about that she must not have been aware of what was happening to her. To the contrary, several witnesses testified to Mrs. Underwood's demeanor before and after Jones's assault. The nurses testified that, prior to the assault, Mrs. Underwood could make moaning sounds and that she realized someone was touching her. They also testified that after the attempted assault, she did not respond well and they could tell something was wrong with her. Louis Underwood, Mrs. Underwood's son, testified that shortly before Christmas, his mother appeared frightened. He said she seemed to want to tell him something, but was unable to express her thoughts. After the assault, Mr. Underwood testified that his mother seemed to give up on life. Mrs. Rigby was alerted to the attack by her mother shouting, "Oh, oh" so loudly she could hear her from down the hall. The fact that Mrs. Underwood responded to the assault by crying out is evidence that she was aware of what was happening to her. The evidence is sufficient to find that Mrs. Underwood suffered conscious physical and emotional pain as a result of the attempted sexual assault.

 Healthcare next contends that neither Mrs. Rigby nor Mrs. Underwood satisfied the rigorous standards required for recovery of mental anguish damages. When the elements of damages considered by the jury include the more amorphous, discretionary damages, such as mental anguish and pain and suffering, the determination of the amount of damages will generally be left to the discretion of the jury. *See Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 841 (Tex.1997). The determination of the amount of money that will compensate the plaintiff for pain and mental anguish involves a consideration of elements for which no mathematical standard exists except what an impartial jury may deem adequate. *Dico Tire, Inc. v. Cisneros*, 953 S.W.2d 776, 792 (Tex.App.-Corpus Christi 1997, writ denied). Unless the award is so large as to indicate that it was influenced by passion, prejudice, or other improper motive, the jury verdict will not be set aside. *Id.* Therefore, the question of damages, if not excessive, is properly left for the jury to determine. *Owens–Corning Fiberglas Corp. v. Martin*, 942 S.W.2d 712, 719 (Tex.App.-Dallas 1997, no writ). A jury's discretion in compensation for mental anguish is limited to that which causes a "substantial disruption in the plaintiff's daily routine, or a high degree of mental pain and distress." *Saenz v. Fid. & Guar. Ins.*, 925 S.W.2d 607, 614 (Tex.1996).

 The standard of review for an excessive damages complaint is factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.1998). We employ the same test for determining excessive damages as for any factual sufficiency question. *See Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986). We review the evidence, keeping in mind it is the jury's role, not ours, to judge the credibility of the evidence, to assign the

weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

In this case, the trial judge reviewed the evidence in support of both actual and exemplary damages. As noted earlier, the judge found factually insufficient evidence to support the amount of the damages and ordered a remittitur. To sustain appellant's challenge to the trial judge's damage award, we would have to conclude the evidence supporting the finding is so weak as to indicate it is clearly wrong and unjust. *See id.* Healthcare argues that Mrs. Rigby's daily routine was not altered; therefore, she cannot recover mental anguish damages. Disruption in the plaintiff's daily routine is not the only element to be considered. The jury was also entitled to consider whether the event caused Mrs. Rigby a high degree of mental pain and distress. The evidence shows that when Mrs. Rigby observed the attempted sexual assault on her mother, she was scared, angry, crying, shaking, and afraid "he might do it again." Mrs. Rigby and her son testified that Mrs. Rigby passes LaPorte every day and for several weeks after the assault, every time she passed LaPorte, Mrs. Rigby relived the assault and cried. Mrs. Rigby testified this event was the most traumatic event of her life. She also testified she still has nightmares about the assault. With regard to Mrs. Underwood's mental pain and anguish, her daughter, son, grandson, and caretakers testified Mrs. Underwood's demeanor was dramatically changed after the assault. Because the evidence is sufficient to support the damages award as remitted, we overrule Healthcare's fourth issue.

### Remittitur

Mrs. Rigby attempts to file a cross-point alleging the remittitur was improper. She contends the amount awarded in the original judgment prior to the remittitur should stand. Texas Rule of Appellate Procedure 46.2 allows the remitting party to contend that all or part of the remittitur should not have been required, but the remitting party must perfect an appeal to raise that point. TEX.R.APP. P. 46.2. Rule 26.1(d) of the Texas Rules of Appellate Procedure provides that if any party files a notice of appeal, another party may file a notice of appeal within the appealable period stated in Rule 26.1(a) or fourteen days after the first filed notice of appeal, whichever is later. TEX.R.APP. P. 26.1(a), (d). Judgment was signed in the trial court on January 31, 2000. LaPorte filed its notice of appeal on June 30, 2000. Therefore, Mrs. Rigby's notice of appeal was due July 14, 2000. Mrs. Rigby filed a motion to extend time to file notice of appeal on August 31, 2000, which this court denied. Because we do not have a timely perfected appeal from Mrs. Rigby, we cannot consider her cross-point challenging the remittitur. Prior to submission of this appeal, Healthcare filed a motion to strike Mrs. Rigby's cross-point. That motion is granted.

### Proximate Cause

In its fifth issue, Healthcare claims the evidence is legally and factually insufficient to support the jury's finding of proximate cause. In reviewing a legal sufficiency challenge, we consider all the evidence in the light most favorable to the verdict and indulge every reasonable inference deducible from the evidence in prevailing party's favor. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). In reviewing a factual sufficiency challenge, we consider all the evidence both supporting and contrary to the jury's finding. *Plas–Tex., Inc. v. U.S.*

*Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989).

■■■■ Proximate cause consists of both cause in fact and foreseeability. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992). Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred. *Prudential Ins. Co. v. Jefferson Assocs.,* 896 S.W.2d 156, 161 (Tex.1995). At some point in the causal chain, the defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal causation. *Springall v. Fredericksburg Hosp. & Clinic,* 225 S.W.2d 232, 235 (Tex.Civ.App.-San Antonio 1949, no writ).

> The law does not hold one legally responsible for the remote results of his wrongful acts and therefore a line must be drawn between immediate and remote causes. The doctrine of proximate cause is employed to determine and fix this line and is the result of an effort by the courts to avoid, as far as possible the metaphysical and philosophical niceties in the age-old discussion of causation, and to lay down a rule of general application which will, as nearly as may be done by a general rule, apply a practical test, the test of common experience, to human conduct when determining legal rights and legal liability.

*Id.*

■■■■ To be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent, the negligence must also be a substantial factor in bringing about the plaintiff's harm. *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995). The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable people to regard it as a cause, in which there lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 472 (Tex.1991).

The Supreme Court considered the parameters of legal causation in *Bell v. Campbell,* 434 S.W.2d 117 (Tex.1968). In *Bell,* two cars collided, and a trailer attached to one of them disengaged and overturned in the opposite lane. A number of people gathered, and three of them were attempting to move the trailer when they were struck by another vehicle. *Id.* at 119. The court held that the parties involved in the first accident did not proximately cause plaintiffs' injuries, reasoning:

> All acts and omissions charged against respondents had run their course and were complete. Their negligence did not actively contribute in any way to the injuries involved in this suit. It simply created a condition which attracted [the plaintiffs] to the scene, where they were injured by a third party.

*Id.* at 122.

Healthcare, citing *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472 (Tex. 1995), contends the harm suffered by Mrs. Underwood and Mrs. Rigby was not proximately caused by its negligence in failing to protect Mrs. Underwood from Jones. In *Doe,* a volunteer working for the Boys Club sexually molested three boys who were members of the Boys Club. *Id.* at 475. The boys then sued the Boys Club, claiming the failure to investigate its volunteers proximately caused the boys' damages. *Id.* at 476. In *Doe,* the volunteer was performing community service as part of a sentence for a conviction of driving while intoxicated. *Id.* at 475. The volunteer also had one other DWI conviction. *Id.* The court held the prior DWI convic-

tions did not indicate criminal conduct in any way akin to sexual assault of young boys. *Id.* at 478. Therefore, if the Boys Club had investigated the volunteer, its investigation would not have caused the club to reasonably anticipate his subsequent sexual assaults of the boys. *Id.*

■ In this case, Healthcare's negligence was both foreseeable and the cause in fact of Mrs. Underwood's and Mrs. Rigby's damages. Almost every witness testified that it was foreseeable that Jones could harm one of the elderly female residents. Jones's history at Anahuac, San Jacinto Hospital, and LaPorte indicated he displayed sexually deviant behavior and posed a threat to elderly disabled residents. Further, Healthcare's negligence was a substantial factor in bringing about the harm to Mrs. Underwood and Mrs. Rigby. Healthcare argues that it simply created a condition that made the assault possible; therefore, the causal link is too attenuated to show cause in fact. This is not a case, however, where all forces involved in the original act of negligence had come to rest. Nor is this a case, such as *Doe*, in which the defendant could not have known the propensity of the actor had it investigated him. Here, Jones's prior conduct was indicative of his future conduct and the original act of Healthcare's negligence had not come to rest before the assault on Mrs. Underwood. Considering the evidence in the light most favorable to the verdict, we find the evidence is legally sufficient to show Healthcare's negligence was a substantial factor in bringing about the injury. After considering all the evidence both in support of and contrary to the jury's finding of proximate cause, we find the evidence is not so weak that the finding is clearly wrong and manifestly unjust.

■ Healthcare further contends the jury's apportionment of eighty percent causation to Healthcare and twenty percent causation to Dr. Rapp is not supported by factually sufficient evidence. Because we have discussed the evidence supporting the jury's finding of proximate cause and found the evidence sufficient, we need not repeat that discussion here. There is also evidence that Dr. Rapp, who knew Jones's history at Anahuac and at San Jacinto, but still recommended his admission to LaPorte, was at fault. Even if a different percentage allocation could be supported by the evidence, an appellate court may not substitute its judgment for that of the jury. *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 235 (Tex.App.-Houston [14th Dist.] 1996, writ denied). Having found sufficient evidence that both Healthcare and Dr. Rapp were at fault, we find no basis for interfering with the jury's apportionment of negligence. Accordingly, we overrule issue five.

In its sixth issue, Healthcare contends it is entitled to a new trial in the interests of fairness and justice. Texas Rule of Appellate Procedure 43.3 states:

> When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when:
>
> (a) a remand is necessary for further proceedings; or
>
> (b) the interests of justice require a remand for another trial.

TEX.R.APP. P. 43.3.

Appellate courts have remanded to the trial court in the interest of justice when the applicable law has changed between the time of trial and the disposition of the appeal, precedent has been overruled, or to allow a party to amend pleadings. *See, e.g., In re Doe*, 19 S.W.3d 278, 290 (Tex. 2000); *Boyles v. Kerr*, 855 S.W.2d 593, 603 (Tex.1993); *Twyman v. Twyman*, 855 S.W.2d 619, 626 (Tex.1993); *Westgate, Ltd.*

*v. State,* 843 S.W.2d 448, 455 (Tex.1992); *L.M.B. Corp. v. Gurecky,* 501 S.W.2d 300, 303 (Tex.1973). In this case we are not presented with any of those exceptions. We have found sufficient evidence to support the plaintiff's cause of action for negligence and actual damages as remitted. We have further found that the harm sustained by plaintiff was proximately caused by the criminal act of Morris Jones. Therefore, punitive damages are not recoverable under section 41.005 of the Civil Practice and Remedies Code. There are no remaining issues requiring remand. Healthcare's sixth issue is overruled.

The judgment of the trial court is modified to delete assessment of punitive damages. As modified, the judgment of the trial court is affirmed.

SCOTT BRISTER, C.J., and WANDA McKEE FOWLER, J., concurring.

SCOTT BRISTER, Chief Justice, concurring.

I concur in the Court's judgment, but write separately as to two points. First, I disagree that Virginia Rigby judicially admitted that all harm resulted from the acts of Morris Jones *and him alone.* A judicial admission must be clear, deliberate, and unequivocal. *See Regency Advantage Ltd. Partnership v. Bingo Idea-Watauga, Inc.,* 936 S.W.2d 275, 278 (Tex.1996). Rigby admitted in her sixth amended petition that Jones committed an assault, but also alleged that various common law and statutory violations by Healthcare Centers of Texas, Inc. allowed him to do so. The allegation that Jones committed the assault is not an unequivocal admission that no one else played a part.

Nevertheless, I agree with the Court that Texas law prohibits Rigby from recovering any punitive damages from Health-

care. In 1995, the Legislature passed a statute prohibiting recovery of such damages from a defendant "because of the criminal act of another." *See* TEX. CIV. PRAC. & REM.CODE § 41.005(a). No one disputes that Jones committed a criminal act.

Pointing to the jury charge and the judgment, Rigby asserts her award was for the criminal acts of *Healthcare,* not the criminal acts of *another.* Her able counsel have provided us with statements by a sponsor of the statute and a lobbyist suggesting they did not read the statute to apply to concurrent criminal acts (that is, when there are criminal acts by both the defendant and another). Such statements do not constitute legislative history. *See General Chemical Corp. v. De La Lastra,* 852 S.W.2d 916, 923 (Tex.1993). Nor can they justify rewriting the statute. *See Texas Dept. of Public Safety v. Kreipe,* 29 S.W.3d 334, 338 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

The second section of this statute contains several exceptions, one of which allows punitive damages if "the defendant is criminally responsible as a party to the criminal act" of another. *See* TEX. CIV. PRAC. & REM.CODE § 41.005(b)(2). In other words, punitive damages are expressly allowed against an accomplice.[1] But an accomplice is guilty of his own crime. *See* TEX. PEN.CODE § 7.01. If Rigby's interpretation is correct, this exception is completely superfluous—accomplices have committed their own concurrent crime, and would never be covered by a statute applying to defendants sued for the criminal act of another. We must construe this statute as a whole, giving each provision effect. TEX. GOV'T CODE § 311.021(2); *Helena Chemical Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001). By creating an ex-

---

**1.** No one argues Healthcare was an accomplice to Jones's assault.

press exception for concurrent acts by accomplices, the Legislature obviously did not share Rigby's interpretation that the statute had no application to concurrent criminal acts at all.

Finally, a note of caution should accompany the Court's affirmation of bystander damages for Virginia Rigby. Bystander recovery is a species of negligent infliction of emotional distress, an action generally not recognized in Texas. *See Boyles v. Kerr,* 855 S.W.2d 593, 595–96 (Tex.1993) (holding mental anguish damages compensable only in connection with a breach of some other duty imposed by law). It is not available in medical malpractice cases. *See Edinburg Hosp. Authority v. Trevino,* 941 S.W.2d 76, 81 (Tex.1997). I agree with the Court this is not a medical malpractice case, as the propriety of failing to supervise a sexual deviant in a nursing home is within the common knowledge of laymen. *See Golden Villa Nursing Home, Inc. v. Smith,* 674 S.W.2d 343, 349 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.) (holding propriety of failing to supervise patient who wandered off from nursing home did not require expert testimony). But it is not at all clear that bystander recovery should be extended to a fact situation like this one.

Bystander damages can be recovered by a family member who is located near the scene of and directly perceives an accident. *Boyles,* 855 S.W.2d at 598. But as the use of the word "accident" implies, bystander recovery has been allowed in Texas almost exclusively in auto accident cases. It is one thing to expect a driver to know that running over a person may cause severe shock to family members standing by; it is quite another to expect a nursing home administrator to know that admitting a sexual deviant may cause severe shock to family members who stand by while he commits deviant acts upon their loved ones.

Nevertheless, Healthcare's appeal includes no argument that a bystander cause of action does not exist in this situation. Thus, it has waived any error. *See* TEX. R.APP. P. 38.1.

WANDA McKEE FOWLER, Justice, concurring.

I join in all of the majority's opinion except for its discussion of the punitive damages issues. On that issue, I concur in the result.

The majority opinion has set forth the facts of the case and the issues, so I will not revisit them. I do, however, want to address one aspect of the case that I believe was not fully explored by either of the parties. This is a new section of the civil practice and remedies code, and, as the majority expresses, no case law exists on the applicability of the section to this fact situation.

One problem with this case is, and always has been, that the parties avoided discussing the main statutory issue in the case: when a corporation is sued for its own alleged criminal act but a criminal act of a third party is also responsible for the injuries sued upon, does section 41.00(a) of the Civil Practice and Remedies Code bar exemplary damages? LaPorte has always said simply that Rigby was suing for Morris's sexual assault of her elderly mother and, therefore, section 41.005(a) bars exemplary damages. Rigby has always responded that she is suing, not for Morris's sexual assault, but for LaPorte's commission of injury to an elderly individual, *see* TEX. PEN.CODE ANN. § 22.04 (Vernon Supp. 2002); because that is a separate crime that LaPorte committed, section 41.005(a) does not apply. Both are right—at least partly so. LaPorte is right that Rigby is suing for the harm that resulted from

Morris's sexual assault of Rigby's mother, and Rigby is right that she is suing for LaPorte's alleged commission of injury to an elderly individual. But, neither La-Porte nor Rigby explained in any detail why the other's argument was faulty.[1] That left us to grapple with the issue ourselves. And, what the majority opinion concludes—I think rightly—is that 41.005(a) does apply. What I want to do in this concurrence is discuss in more detail the reasons for that conclusion and its ramifications.

The first paragraph of the statute provides the following:

(a) In an action *arising from* harm resulting from an assault ... or other criminal act, a court may not award exemplary damages against a defendant *because of the criminal act of another.*

TEX. CIV. PRAC. & REM.CODE ANN. § 41.005 (Vernon 1997). This paragraph is broadly written, and it appears to apply to this case.

First, clearly, this action arose from, and was brought because of, Morris's sexual assault of Rigby's mother. If the sexual assault had not happened, there would not have been a suit. Or, if there had been a suit, it would have to be because Rigby's mother was injured in some other way on account of LaPorte's failure to act.

Second, it is impossible to look at this case and say that the jury assessed $50 million in damages against LaPorte and never gave a second thought to Morris's criminal act. Yes, the jury question asked the jury to assess damages based on La-Porte's criminal act, but that act has no significance by itself. It can be viewed only in the context of what it failed to prevent: Morris's rape of a fellow resident of the nursing home. Consequently, for purposes of damages—for any purpose really—the two acts are so intertwined that one cannot be considered without the other. In such a case, the jury's award had to be based, at least in part, on the criminal act of another. This is what the statute bars.

According to Rigby's counsel, this means that any time a third party commits a criminal act, all joint tortfeasors are automatically immune from exemplary damages. They would have us read paragraph (a) to provide that a court may not award exemplary damages against anyone *solely* because of the criminal act of another. Thus, they want us to conclude that if the corporation was partly responsible (and committed a criminal act) and the third party was partly responsible, a plaintiff could obtain punitive damages. However, paragraph (a) does not contain this limitation. A look at the four situations contained in paragraph (b)—for which a plaintiff can obtain punitive damages against a corporation—helps clarify the issue.

Paragraph (b) provides that in the following situations, a defendant will be liable for exemplary damages in spite of paragraph (a)'s broad proscription against exemplary damages: (1) when an employee of the corporation commits the act; (2) when the corporation itself is criminally responsible as a party[2] to the act; (3)

---

**1.** Rigby did address the issue in her motion for rehearing but LaPorte has still never addressed the problem head-on.

**2.** The Penal Code defines criminal responsibility for the conduct of another in the following way:

(a) A person is criminally responsible for an offense committed by the conduct of another if:
(1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;

when the criminal act occurs at a place qualifying as a common nuisance (a place people habitually go for prostitution, gambling, to shoot firearms, to engage in organized crime, or to sell, possess, manufacture or use controlled substances); and (4) when a landlord intentionally or knowingly fails to comply with the Property Code's requirements to provide certain security devices for tenants.

For two reasons, I believe this subsection answers Rigby's claim. First, in reading the whole section, we are to assume that the legislature did not commit a vain act—that it listed these situations in paragraph (b) because it thought they were covered by paragraph (a)'s language, and it wanted a plaintiff to be able to obtain punitive damages in these situations. *See Meritor Auto., Inc. v. Ruan Leasing Co.,* 44 S.W.3d 86, 90 (Tex.2001) (holding a court should examine the entire statute to determine its meaning); *Cayan v. Cayan,* 38 S.W.3d 161, 165–66 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (stating that the court does not "lightly presume that the Legislation did a useless act"). We can reasonably assume, then, the legislature listed in paragraph (b) every situation for which it thought a plaintiff should be able—at least potentially—to obtain punitive damages. Second, a common theme—similar to this case—exists in three of these situations: they each involve a criminal act by a third party in conjunction with a grossly negligent or intentional act by a corporation, so that the criminal act likely would not have occurred without the simul-

taneous "bad" act of the corporation. For example, if the corporate employer had not hired the employee, the rape would not have occurred; if the corporate landlord had put latches on the windows of its apartments, the assault would not have occurred; if the corporation had not operated an illegal gambling operation, the murder would not have occurred. In these situations—like here—the acts are so intertwined, it is impossible to consider one without the other and one could not have occurred without the other.

If the situations enumerated in paragraph (b) would otherwise fall within paragraph (a), so would this one; if the legislature believed—as it apparently did—that these situations were covered by paragraph (a)'s bar on exemplary damages, so is this one.

In short, in spite of the horrid events of this case, we cannot ignore the plain language of the statute. That language states that a corporation is not liable for exemplary damages because of the criminal act of another. Here, LaPorte was subjected to exemplary damages in part, if not primarily, because of the criminal act of another. For that reason, the damages are barred.[3]

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense. Tex. Pen.Code Ann. § 7.02.

3. It may very well be that the Legislature did not include this situation only because it did not think of it when it was drafting the section. But, we have to apply what the legislature actually included in the legislation, not what it might have included if it had been able to contemplate the situation.